# RHODE ISLAND *v.* INNIS

No. 78–1076.   Argued October 30, 1979—Decided May 12, 1980

STEWART, J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 304. BURGER, C. J., filed an opinion concurring in the judgment, *post*, p. 304. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 305. STEVENS, J., filed a dissenting opinion, *post*, p. 307.

*Dennis J. Roberts II,* Attorney General of Rhode Island, argued the cause for petitioner. With him on the briefs were *Nancy Marks Rahmes* and *Stephen Lichatin III,* Special Assistant Attorneys General.

*John A. MacFadyen III* argued the cause for respondent. With him on the brief was *William F. Reilly.**

MR. JUSTICE STEWART delivered the opinion of the Court.

In *Miranda* v. *Arizona,* 384 U. S. 436, 474, the Court held that, once a defendant in custody asks to speak with a lawyer, all interrogation must cease until a lawyer is present. The issue in this case is whether the respondent was "interrogated" in violation of the standards promulgated in the *Miranda* opinion.

I

On the night of January 12, 1975, John Mulvaney, a Providence, R. I., taxicab driver, disappeared after being dispatched to pick up a customer. His body was discovered four days later buried in a shallow grave in Coventry, R. I. He had died from a shotgun blast aimed at the back of his head.

On January 17, 1975, shortly after midnight, the Providence police received a telephone call from Gerald Aubin, also a taxicab driver, who reported that he had just been robbed by a man wielding a sawed-off shotgun. Aubin further reported that he had dropped off his assailant near Rhode Island College in a section of Providence known as Mount Pleasant. While at the Providence police station waiting to give a statement, Aubin noticed a picture of his assailant on a bulletin board. Aubin so informed one of the police officers present. The officer prepared a photo array, and again Aubin identified a picture of the same person. That person was the respondent. Shortly thereafter, the Providence police began a search of the Mount Pleasant area.

At approximately 4:30 a. m. on the same date, Patrolman Lovell, while cruising the streets of Mount Pleasant in a pa-

---

*Briefs of *amici curiae* were filed by *George Deukmejian,* Attorney General, *Robert H. Philibosian,* Chief Assistant Attorney General, and *William E. James,* Senior Assistant Attorney General, for the State of California; and by *Fred Okrand* and *Mark D. Rosenbaum* for the ACLU Foundation of Southern California et al.

trol car, spotted the respondent standing in the street facing him. When Patrolman Lovell stopped his car, the respondent walked towards it. Patrolman Lovell then arrested the respondent, who was unarmed, and advised him of his so-called *Miranda* rights. While the two men waited in the patrol car for other police officers to arrive, Patrolman Lovell did not converse with the respondent other than to respond to the latter's request for a cigarette.

Within minutes, Sergeant Sears arrived at the scene of the arrest, and he also gave the respondent the *Miranda* warnings. Immediately thereafter, Captain Leyden and other police officers arrived. Captain Leyden advised the respondent of his *Miranda* rights. The respondent stated that he understood those rights and wanted to speak with a lawyer. Captain Leyden then directed that the respondent be placed in a "caged wagon," a four-door police car with a wire screen mesh between the front and rear seats, and be driven to the central police station. Three officers, Patrolmen Gleckman, Williams, and McKenna, were assigned to accompany the respondent to the central station. They placed the respondent in the vehicle and shut the doors. Captain Leyden then instructed the officers not to question the respondent or intimidate or coerce him in any way. The three officers then entered the vehicle, and it departed.

While en route to the central station, Patrolman Gleckman initiated a conversation with Patrolman McKenna concerning the missing shotgun.[1] As Patrolman Gleckman later testified:

> "A. At this point, I was talking back and forth with Patrolman McKenna stating that I frequent this area while on patrol and [that because a school for handicapped children is located nearby,] there's a lot of handicapped children running around in this area, and God

---

[1] Although there was conflicting testimony about the exact seating arrangements, it is clear that everyone in the vehicle heard the conversation.

forbid one of them might find a weapon with shells and they might hurt themselves." App. 43–44.

Patrolman McKenna apparently shared his fellow officer's concern:

"A. I more or less concurred with him [Gleckman] that it was a safety factor and that we should, you know, continue to search for the weapon and try to find it." *Id.,* at 53.

While Patrolman Williams said nothing, he overheard the conversation between the two officers:

"A. He [Gleckman] said it would be too bad if the little—I believe he said a girl—would pick up the gun, maybe kill herself." *Id.,* at 59.

The respondent then interrupted the conversation, stating that the officers should turn the car around so he could show them where the gun was located. At this point, Patrolman McKenna radioed back to Captain Leyden that they were returning to the scene of the arrest, and that the respondent would inform them of the location of the gun. At the time the respondent indicated that the officers should turn back, they had traveled no more than a mile, a trip encompassing only a few minutes.

The police vehicle then returned to the scene of the arrest where a search for the shotgun was in progress. There, Captain Leyden again advised the respondent of his *Miranda* rights. The respondent replied that he understood those rights but that he "wanted to get the gun out of the way because of the kids in the area in the school." The respondent then led the police to a nearby field, where he pointed out the shotgun under some rocks by the side of the road.

On March 20, 1975, a grand jury returned an indictment charging the respondent with the kidnaping, robbery, and murder of John Mulvaney. Before trial, the respondent moved to suppress the shotgun and the statements he had

made to the police regarding it. After an evidentiary hearing at which the respondent elected not to testify, the trial judge found that the respondent had been "repeatedly and completely advised of his *Miranda* rights." He further found that it was "entirely understandable that [the officers in the police vehicle] would voice their concern [for the safety of the handicapped children] to each other." The judge then concluded that the respondent's decision to inform the police of the location of the shotgun was "a waiver, clearly, and on the basis of the evidence that I have heard, and [*sic*] intelligent waiver, of his [*Miranda*] right to remain silent." Thus, without passing on whether the police officers had in fact "interrogated" the respondent, the trial court sustained the admissibility of the shotgun and testimony related to its discovery. That evidence was later introduced at the respondent's trial, and the jury returned a verdict of guilty on all counts.

On appeal, the Rhode Island Supreme Court, in a 3–2 decision, set aside the respondent's conviction. 120 R. I. —, 391 A. 2d 1158. Relying at least in part on this Court's decision in *Brewer* v. *Williams*, 430 U. S. 387, the court concluded that the respondent had invoked his *Miranda* right to counsel and that, contrary to *Miranda*'s mandate that, in the absence of counsel, all custodial interrogation then cease, the police officers in the vehicle had "interrogated" the respondent without a valid waiver of his right to counsel. It was the view of the state appellate court that, even though the police officers may have been genuinely concerned about the public safety and even though the respondent had not been addressed personally by the police officers, the respondent nonetheless had been subjected to "subtle coercion" that was the equivalent of "interrogation" within the meaning of the *Miranda* opinion. Moreover, contrary to the holding of the trial court, the appellate court concluded that the evidence was insufficient to support a finding of waiver. Having

concluded that both the shotgun and testimony relating to its discovery were obtained in violation of the *Miranda* standards and therefore should not have been admitted into evidence, the Rhode Island Supreme Court held that the respondent was entitled to a new trial.

We granted certiorari to address for the first time the meaning of "interrogation" under *Miranda* v. *Arizona.* 440 U. S. 934.

## II

In its *Miranda* opinion, the Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. More specifically, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U. S., at 444. Those safeguards included the now familiar *Miranda* warnings—namely, that the defendant be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires"—or their equivalent. *Id.*, at 479.

The Court in the *Miranda* opinion also outlined in some detail the consequences that would result if a defendant sought to invoke those procedural safeguards. With regard to the right to the presence of counsel, the Court noted:

> "Once warnings have been given, the subsequent procedure is clear. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to

have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." *Id.*, at 473–474.

In the present case, the parties are in agreement that the respondent was fully informed of his *Miranda* rights and that he invoked his *Miranda* right to counsel when he told Captain Leyden that he wished to consult with a lawyer. It is also uncontested that the respondent was "in custody" while being transported to the police station.

The issue, therefore, is whether the respondent was "interrogated" by the police officers in violation of the respondent's undisputed right under *Miranda* to remain silent until he had consulted with a lawyer.[2] In resolving this issue, we first define the term "interrogation" under *Miranda* before turning to a consideration of the facts of this case.

## A

The starting point for defining "interrogation" in this context is, of course, the Court's *Miranda* opinion. There the Court observed that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*, at 444 (emphasis added). This passage and other references throughout the opinion to "questioning" might suggest that the *Miranda* rules were to apply only to those police interrogation practices that involve express questioning of a defendant while in custody.

---

[2] Since we conclude that the respondent was not "interrogated" for *Miranda* purposes, we do not reach the question whether the respondent waived his right under *Miranda* to be free from interrogation until counsel was present.

We do not, however, construe the *Miranda* opinion so narrowly. The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. *Id.*, at 457–458. The police practices that evoked this concern included several that did not involve express questioning. For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation. *Id.*, at 453. A variation on this theme discussed in *Miranda* was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution. *Ibid.* The Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to "posi[t]" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society." *Id.*, at 450. It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.[3]

This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. As the Court in *Miranda* noted:

"Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily with-

[3] To limit the ambit of *Miranda* to express questioning would "place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda.*" *Commonwealth* v. *Hamilton*, 445 Pa. 292, 297, 285 A. 2d 172, 175.

out any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . .* Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.,* at 478 (emphasis added).

It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.[4]

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express

---

[4] There is language in the opinion of the Rhode Island Supreme Court in this case suggesting that the definition of "interrogation" under *Miranda* is informed by this Court's decision in *Brewer* v. *Williams,* 430 U. S. 387. 120 R. I. ——, ——, 391 A. 2d 1158, 1161–1162. This suggestion is erroneous. Our decision in *Brewer* rested solely on the Sixth and Fourteenth Amendment right to counsel. 430 U. S., at 397–399. That right, as we held in *Massiah* v. *United States,* 377 U. S. 201, 206, prohibits law enforcement officers from "deliberately elicit[ing]" incriminating information from a defendant in the absence of counsel after a formal charge against the defendant has been filed. Custody in such a case is not controlling; indeed, the petitioner in *Massiah* was not in custody. By contrast, the right to counsel at issue in the present case is based not on the Sixth and Fourteenth Amendments, but rather on the Fifth and Fourteenth Amendments as interpreted in the *Miranda* opinion. The definitions of "interrogation" under the Fifth and Sixth Amendments, if indeed the term "interrogation" is even apt in the Sixth Amendment context, are not necessarily interchangeable, since the policies underlying the two constitutional protections are quite distinct. See Kamisar, *Brewer v. Williams, Massiah,* and *Miranda:* What is "Interrogation"? When Does it Matter?, 67 Geo. L. J. 1, 41–55 (1978).

questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response [5] from the suspect.[6] The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.[7] But, since the police surely

---

[5] By "incriminating response" we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda:*

"No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." 384 U. S., at 476–477.

[6] One of the dissenting opinions seems totally to misapprehend this definition in suggesting that it "will almost certainly exclude every statement [of the police] that is not punctuated with a question mark." *Post,* at 312.

[7] This is not to say that the intent of the police is irrelevant, for it

cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.[8]

## B

Turning to the facts of the present case, we conclude that the respondent was not "interrogated" within the meaning of *Miranda*. It is undisputed that the first prong of the definition of "interrogation" was not satisfied, for the conversation between Patrolmen Gleckman and McKenna included no express questioning of the respondent. Rather, that conversation was, at least in form, nothing more than a dialogue between the two officers to which no response from the respondent was invited.

Moreover, it cannot be fairly concluded that the respondent was subjected to the "functional equivalent" of questioning. It cannot be said, in short, that Patrolmen Gleckman and McKenna should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent. There is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the

---

may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

[8] Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect.

record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest.[9]

The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

The Rhode Island Supreme Court erred, in short, in equating "subtle compulsion" with interrogation. That the officers' comments struck a responsive chord is readily apparent. Thus, it may be said, as the Rhode Island Supreme Court did say, that the respondent was subjected to "subtle compulsion." But that is not the end of the inquiry. It must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.[10] This was not established in the present case.

---

[9] The record in no way suggests that the officers' remarks were *designed* to elicit a response. See n. 7, *supra*. It is significant that the trial judge, after hearing the officers' testimony, concluded that it was "entirely understandable that [the officers] would voice their concern [for the safety of the handicapped children] to each other."

[10] By way of example, if the police had done no more than to drive past the site of the concealed weapon while taking the most direct route to the police station, and if the respondent, upon noticing for the first time

For the reasons stated, the judgment of the Supreme Court of Rhode Island is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, concurring.

I would prefer to reverse the judgment for the reasons stated in my dissenting opinion in *Brewer* v. *Williams,* 430 U. S. 387 (1977); but given that judgment and the Court's opinion in *Brewer,* I join the opinion of the Court in the present case.

MR. CHIEF JUSTICE BURGER, concurring in the judgment.

Since the result is not inconsistent with *Miranda* v. *Arizona,* 384 U. S. 436 (1966), I concur in the judgment.

The meaning of *Miranda* has become reasonably clear and law enforcement practices have adjusted to its strictures; I would neither overrule *Miranda,* disparage it, nor extend it at this late date. I fear, however, that the rationale in Parts II–A and II–B of the Court's opinion will not clarify the tension between this holding and *Brewer* v. *Williams,* 430 U. S. 387 (1977), and our other cases. It may introduce new elements of uncertainty; under the Court's test, a police officer, in the brief time available, apparently must evaluate the suggestibility and susceptibility of an accused. See, *e. g., ante,* at 302, n. 8. Few, if any, police officers are competent to make the kind of evaluation seemingly contemplated; even a psychiatrist asked to express an expert opinion on these aspects of a suspect in custody would very likely employ extensive questioning and observation to make the judgment now charged to police officers.

---

the proximity of the school for handicapped children, had blurted out that he would show the officers where the gun was located, it could not seriously be argued that this "subtle compulsion" would have constituted "interrogation" within the meaning of the *Miranda* opinion.

Trial judges have enough difficulty discerning the boundaries and nuances flowing from post-*Miranda* opinions, and we do not clarify that situation today.[*]

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

I am substantially in agreement with the Court's definition of "interrogation" within the meaning of *Miranda* v. *Arizona,* 384 U. S. 436 (1966). In my view, the *Miranda* safeguards apply whenever police conduct is intended or likely to produce a response from a suspect in custody. As I read the Court's opinion, its definition of "interrogation" for *Miranda* purposes is equivalent, for practical purposes, to my formulation, since it contemplates that "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Ante,* at 302, n. 7. Thus, the Court requires an objective inquiry into the likely effect of police conduct on a typical individual, taking into account any special susceptibility of the suspect to certain kinds of pressure of which the police know or have reason to know.

I am utterly at a loss, however, to understand how this objective standard as applied to the facts before us can rationally lead to the conclusion that there was no interrogation. Innis was arrested at 4:30 a. m., handcuffed, searched, advised of his rights, and placed in the back seat of a patrol car. Within a short time he had been twice more advised of his rights and driven away in a four-door sedan with three police officers. Two officers sat in the front seat and one sat beside Innis in the back seat. Since the car traveled no more than a mile before Innis agreed to point out the location of

---

[*]That we may well be adding to the confusion is suggested by the problem dealt with in *California* v. *Braeseke,* 444 U. S. 1309 (1980) (REHNQUIST, J., in chambers) (difficulty of determining whether a defendant has waived his *Miranda* rights), and cases cited therein.

the murder weapon, Officer Gleckman must have begun almost immediately to talk about the search for the shotgun.

The Court attempts to characterize Gleckman's statements as "no more than a few offhand remarks" which could not reasonably have been expected to elicit a response. *Ante,* at 303. If the statements had been addressed to respondent, it would be impossible to draw such a conclusion. The simple message of the "talking back and forth" between Gleckman and McKenna was that they had to find the shotgun to avert a child's death.

One can scarcely imagine a stronger appeal to the conscience of a suspect—*any* suspect—than the assertion that if the weapon is not found an innocent person will be hurt or killed. And not just any innocent person, but an innocent child—a little girl—a helpless, handicapped little girl on her way to school. The notion that such an appeal could not be expected to have any effect unless the suspect were known to have some special interest in handicapped children verges on the ludicrous. As a matter of fact, the appeal to a suspect to confess for the sake of others, to "display some evidence of decency and honor," is a classic interrogation technique. See, *e. g.,* F. Inbau & J. Reid, Criminal Interrogation and Confessions 60–62 (2d ed. 1967).

Gleckman's remarks would obviously have constituted interrogation if they had been explicitly directed to respondent, and the result should not be different because they were nominally addressed to McKenna. This is not a case where police officers speaking among themselves are accidentally overheard by a suspect. These officers were "talking back and forth" in close quarters with the handcuffed suspect,* traveling past the very place where they believed the weapon was located. They knew respondent would hear and attend to their conversation, and they are chargeable with knowledge

---

*Gleckman may even have been sitting in the back seat beside respondent. See App. 50, 52, 56; but see *id.,* 39, 43, 47, 58.

of and responsibility for the pressures to speak which they created.

I firmly believe that this case is simply an aberration, and that in future cases the Court will apply the standard adopted today in accordance with its plain meaning.

Mr. Justice Stevens, dissenting.

An original definition of an old term coupled with an original finding of fact on a cold record makes it possible for this Court to .vacate the judgment of the Supreme Court of Rhode Island. That court, on the basis of the facts in the record before it, concluded that members of the Providence, R. I., police force had interrogated respondent, who was clearly in custody at the time, in the absence of counsel after he had requested counsel. In my opinion the state court's conclusion that there. was interrogation rests on a proper interpretation of both the facts and the law; thus, its determination that the products of the interrogation were inadmissible at trial should be affirmed.

The undisputed facts can be briefly summarized. Based on information that respondent, armed with a sawed-off shotgun, had just robbed a cabdriver in the vicinity of Rhode Island College, a number of Providence police officers began a thorough search of the area in the early morning of January 17, 1975. One of them arrested respondent without any difficulty at about 4:30 a. m. Respondent did not then have the shotgun in his possession and presumably had abandoned it, or hidden it, shortly before he was arrested. Within a few minutes, at least a dozen officers were on the scene. App. 37. It is fair to infer that an immediate search for the missing weapon was a matter of primary importance.

When a police captain arrived, he repeated the *Miranda* warnings that a patrolman and a sergeant had already given to respondent, and respondent said he wanted an attorney. The captain then ordered two officers who were assigned to

a "caged wagon" to transport respondent to the central station, and ordered a third officer to ride in the back seat with respondent. While the wagon was en route to the station, one of the officers, Officer Gleckman, stated that there was a school for handicapped children in the vicinity and "God forbid" one of them should find the shotgun and hurt herself.[1] As a result of this statement, respondent told the officers that he was willing to show them where the gun was hidden.[2] The wagon returned to the scene and respondent helped the officers locate the gun.

After a suppression hearing, the trial court assumed, without deciding, that Officer Gleckman's statement constituted interrogation. The court nevertheless allowed the shotgun and testimony concerning respondent's connection to it into evidence on the ground that respondent had waived his *Miranda* rights when he consented to help police locate the gun. On appeal from respondent's conviction for kidnaping, robbery and murder, the Rhode Island Supreme Court held that Officer Gleckman's statement constituted impermissible interrogation and rejected the trial court's waiver analysis. It therefore reversed respondent's conviction and remanded for a new trial. Today, the Court reverses the Rhode Island court's resolution of the interrogation issue, creating a new definition of that term and holding, as a matter of law, that the statement at issue in this case did not constitute interrogation.

---

[1] Although the testimony is not entirely clear as to the exact wording of Officer Gleckman's statement, it appears that he talked about the possible danger being to a little girl. App. 59.

[2] After he returned to the scene, respondent told the police captain that he wanted to help them locate the shotgun because he "wanted to get the gun out of the way because of the kids in the area in the school." *Id.*, at 39. Given the timing of respondent's statement and the absence of any evidence that he knew about the school prior to Officer Gleckman's statement, it is clear that respondent's statement was the direct product of the conversation in the police wagon.

# I

As the Court recognizes, *Miranda* v. *Arizona*, 384 U. S. 436, makes it clear that, once respondent requested an attorney, he had an absolute right to have any type of interrogation cease until an attorney was present.[3]   As it also recognizes, *Miranda* requires that the term "interrogation" be broadly construed to include "either express questioning or its functional equivalent." *Ante*, at 300–301.[4]   In my view any statement that would normally be understood by the average listener as calling for a response is the functional equivalent of a direct question, whether or not it is punctuated by a question mark. The Court, however, takes a much narrower view.   It holds that police conduct is not the "functional equivalent" of direct questioning unless the police should have known that what they were saying or doing was likely to elicit an incriminating response from the suspect.[5]   This holding represents a plain departure from the principles set forth in *Miranda*.

---

[3] *Ante*, at 293, 297–298.   In *Miranda* the Court explicitly stated: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."   384 U. S., at 474.

[4] As the Court points out, *ante*, at 299, the Court in *Miranda* was acutely aware of the fact that police interrogation techniques are not limited to direct questioning.

[5] "That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Ante*, at 301.

In limiting its test to police statements "likely to elicit an incriminating response," the Court confuses the scope of the exclusionary rule with the definition of "interrogation."   Of course, any incriminating statement as defined in *Miranda*, quoted *ante*, at 301, n. 5, must be excluded from evidence if it is the product of impermissible interrogation.   But I fail to see how this rule helps in deciding whether a particular statement or tactic constitutes "interrogation."   After all, *Miranda* protects a suspect in Innis' position not simply from interrogation that is likely to be successful, but from any interrogation at all.

In *Miranda* the Court required the now-familiar warnings to be given to suspects prior to custodial interrogation in order to dispel the atmosphere of coercion that necessarily accompanies such interrogations. In order to perform that function effectively, the warnings must be viewed by both the police and the suspect as a correct and binding statement of their respective rights.[6] Thus, if, after being told that he has a right to have an attorney present during interrogation, a suspect chooses to cut off questioning until counsel can be obtained, his choice must be "scrupulously honored" by the police. See *Michigan* v. *Mosley,* 423 U. S. 96, 104; *id.,* at 110, n. 2 (WHITE, J., concurring in result). At the least this must mean that the police are prohibited from making deliberate attempts to elicit statements from the suspect.[7] Yet the Court is unwilling to characterize all such attempts as "interrogation," noting only that "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police

---

[6] "We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." 384 U. S., at 467.

[7] In *Brewer* v. *Williams,* 430 U. S. 387, 398–399, the Court applied the "deliberately elicited" standard in determining that statements were extracted from Williams in violation of his Sixth Amendment right to counsel. Although this case involves Fifth Amendment rights and the *Miranda* rules designed to safeguard those rights, respondent's invocation of his right to counsel makes the two cases indistinguishable. In both cases the police had an unqualified obligation to refrain from trying to elicit a response from the suspect in the absence of his attorney. See Kamisar, *Brewer* v. *Williams, Massiah,* and *Miranda:* What is "Interrogation"? When Does it Matter?, 67 Geo. L. J. 1, 73 (1978).

should have known was reasonably likely to have that effect." [8]
*Ante,* at 302, n. 7.

From the suspect's point of view, the effectiveness of the warnings depends on whether it appears that the police are scrupulously honoring his rights. Apparent attempts to elicit information from a suspect after he has invoked his right to cut off questioning necessarily demean that right and tend to reinstate the imbalance between police and suspect that the *Miranda* warnings are designed to correct.[9] Thus, if the rationale for requiring those warnings in the first place is to be respected, any police conduct or statements that would appear to a reasonable person in the suspect's position to call for a response must be considered "interrogation." [10]

In short, in order to give full protection to a suspect's right to be free from any interrogation at all, the definition of "interrogation" must include any police statement or conduct that has the same purpose or effect as a direct question. Statements that appear to call for a response from the suspect, as well as those that are designed to do so, should be considered interrogation. By prohibiting only those relatively few statements or actions that a police officer should know are likely to elicit an incriminating response, the Court today accords a suspect

---

[8] This factual assumption is extremely dubious. I would assume that police often interrogate suspects without any reason to believe that their efforts are likely to be successful in the hope that a statement will nevertheless be forthcoming.

[9] See White, Police Trickery in Inducing Confessions, 127 U. Pa. L. Rev. 581, 609–611 (1979). As MR. JUSTICE WHITE pointed out in his opinion concurring in the result in *Michigan* v. *Mosley,* 423 U. S. 96, when a suspect invokes his right to an attorney, he is expressing "his own view that he is not competent to deal with the authorities without legal advice." *Id.,* at 110, n. 2. Under these circumstances, continued interrogation is likely to produce the same type of coercive atmosphere that the *Miranda* warnings are supposed to dispel.

[10] I would use an objective standard both to avoid the difficulties of proof inherent in a subjective standard and to give police adequate guidance in their dealings with suspects who have requested counsel.

considerably less protection. Indeed, since I suppose most suspects are unlikely to incriminate themselves even when questioned directly, this new definition will almost certainly exclude every statement that is not punctuated with a question mark from the concept of "interrogation." [11]

The difference between the approach required by a faithful adherence to *Miranda* and the stinted test applied by the Court today can be illustrated by comparing three different ways in which Officer Gleckman could have communicated his fears about the possible dangers posed by the shotgun to handicapped children. He could have:

(1) directly asked Innis:

Will you please tell me where the shotgun is so we can protect handicapped schoolchildren from danger?

(2) announced to the other officers in the wagon:

If the man sitting in the back seat with me should decide to tell us where the gun is, we can protect handicapped children from danger.

or (3) stated to the other officers:

It would be too bad if a little handicapped girl would pick up the gun that this man left in the area and maybe kill herself.

In my opinion, all three of these statements should be considered interrogation because all three appear to be designed to elicit a response from anyone who in fact knew where the gun was located.[12] Under the Court's test, on the other hand,

---

[11] The Court's suggestion, *ante*, at 301, n. 6, that I totally misapprehend the import of its definition is belied by its application of the new standard to the facts of this case.

[12] See White, *Rhode Island v. Innis:* The Significance of a Suspect's Assertion of His Right to Counsel, 17 Am. Crim. L. Rev. 53, 68 (1979), where the author proposes the same test and applies it to the facts of this case, stating:

"Under the proposed objective standard, the result is obvious. Since the conversation indicates a strong desire to know the location of the

the form of the statements would be critical. The third statement would not be interrogation because in the Court's view there was no reason for Officer Gleckman to believe that Innis was susceptible to this type of an implied appeal, *ante,* at 302; therefore, the statement would not be reasonably likely to elicit an incriminating response. Assuming that this is true, see *infra,* at 314–315, then it seems to me that the first two statements, which would be just as unlikely to elicit such a response, should also not be considered interrogation. But, because the first statement is clearly an express question, it *would* be considered interrogation under the Court's test. The second statement, although just as clearly a deliberate appeal to Innis to reveal the location of the gun, would presumably not be interrogation because (a) it was not in form a direct question and (b) it does not fit within the "reasonably likely to elicit an incriminating response" category that applies to indirect interrogation.

As this example illustrates, the Court's test creates an incentive for police to ignore a suspect's invocation of his rights in order to make continued attempts to extract information from him. If a suspect does not appear to be susceptible to a particular type of psychological pressure,[13] the police are apparently free to exert that pressure on him despite his request for counsel, so long as they are careful not to punctuate their statements with question marks. And if, contrary to all reasonable expectations, the suspect makes an

---

shotgun, any person with knowledge of the weapon's location would be likely to believe that the officers wanted him to disclose its location. Thus, a reasonable person in Innis's position would believe that the officers were seeking to solicit precisely the type of response that was given."

[13] As THE CHIEF JUSTICE points out in his concurring opinion, "[f]ew, if any, police officers are competent to make the kind of evaluation seemingly contemplated [by the Court's opinion]" except by close and careful observation. *Ante,* at 304. Under these circumstances, courts might well find themselves deferring to what appeared to be good-faith judgments on the part of the police.

incriminating statement, that statement can be used against him at trial.  The Court thus turns *Miranda*'s unequivocal rule against any interrogation at all into a trap in which unwary suspects may be caught by police deception.

## II

Even if the Court's new definition of the term "interrogation" provided a proper standard for deciding this case, I find it remarkable that the Court should undertake the initial task of applying its new standard to the facts of the present case. As noted above, the trial judge did not decide whether Officer Gleckman had interrogated respondent.  Assuming, *arguendo,* that he had, the judge concluded that respondent had waived his request for counsel by offering to help find the gun.  The Rhode Island Supreme Court disagreed on the waiver questions,[14] and expressly concluded that interrogation had occurred.  Even if the Rhode Island court might have reached a different conclusion under the Court's new definition, I do not believe we should exclude it from participating in a review of the actions taken by the Providence police.  Indeed, given the creation of a new standard of decision at this stage of the litigation, the proper procedure would be to remand to the trial court for findings on the basis of evidence directed at the new standard.

In any event, I think the Court is clearly wrong in holding, as a matter of law, that Officer Gleckman should not have realized that his statement was likely to elicit an incriminating

---

[14] Like the Rhode Island Supreme Court, I think it takes more than a prisoner's answer to a question to waive his right not to have the question asked in the first place. See *Brewer* v. *Williams,* 430 U. S., at 404; *Michigan* v. *Mosley,* 423 U. S., at 110, n. 2 (WHITE, J., concurring in result) ("[T]he accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism"). See also *People* v. *Cunningham,* 49 N. Y. 2d 203, 210, 400 N. E. 2d 360, 364–365 (1980).

response. The Court implicitly assumes that, at least in the absence of a lengthy harangue, a criminal suspect will not be likely to respond to indirect appeals to his humanitarian impulses. It then goes on to state that the officers in this case had no reason to believe that respondent would be unusually susceptible to such appeals. *Ante,* at 302. Finally, although the significance of the officer's intentions is not clear under its objective test, the Court states in a footnote that the record "in no way suggests" that Officer Gleckman's remarks were designed to elicit a response. *Ante,* at 303, n. 9.

The Court's assumption that criminal suspects are not susceptible to appeals to conscience is directly contrary to the teachings of police interrogation manuals, which recommend appealing to a suspect's sense of morality as a standard and often successful interrogation technique.[15] Surely the practical experience embodied in such manuals should not be ignored in a case such as this in which the record is devoid of any evidence—one way or the other—as to the susceptibility of suspects in general or of Innis in particular.

Moreover, there is evidence in the record to support the view that Officer Gleckman's statement was intended to elicit a response from Innis. Officer Gleckman, who was not regularly assigned to the caged wagon, was directed by a police captain to ride with respondent to the police station. Although there is a dispute in the testimony, it appears that Gleckman may well have been riding in the back seat with Innis.[16] The record does not explain why, notwithstanding

---

[15] See, *e. g.,* F. Inbau & J. Reid, Criminal Interrogation and Confessions 60–61 (2d ed. 1967). Under the heading "Urge the Subject to Tell the Truth for the Sake of His Own Conscience, Mental Relief, or Moral Well-being, as Well as 'for the Sake of Everybody Concerned,' and Also Because It Is 'the Only Decent and Honorable Thing to Do,'" the authors advise interrogators to "challenge . . . the offender to display some evidence of decency and honor" by appealing to his religious or moral sensibilities.

[16] Officer Gleckman testified that he was riding in the front seat with the driver. App. 46. However, Officer McKenna, who had also ridden

the fact that respondent was handcuffed, unarmed, and had offered no resistance when arrested by an officer acting alone, the captain ordered Officer Gleckman to ride with respondent.[17]  It is not inconceivable that two professionally trained police officers concluded that a few well-chosen remarks might induce respondent to disclose the whereabouts of the shotgun.[18]  This conclusion becomes even more plausible in light of the emotionally charged words chosen by Officer Gleckman ("God forbid" that a "little girl" should find the gun and hurt herself).[19]

### III

Under my view of the correct standard, the judgment of the Rhode Island Supreme Court should be affirmed because the

---

in the wagon, and the police captain both testified that Gleckman rode in the back seat with the suspect.  *Id.*, at 50–52, 55–56, 38–39.  Thereafter, the third officer in the wagon corroborated Gleckman's testimony.  *Id.*, at 58.

[17] This was apparently a somewhat unusual procedure.  Officer McKenna testified:

"If I remember correctly, the vehicle—Innis was placed in it and the vehicle door was closed, and we were waiting for instructions from Captain Leyden. . . . At that point, Captain Leyden instructed Patrolman Gleckman to accompany us.  There's usually two men assigned to the wagon, but in this particular case he wanted a third man to accompany us, and Gleckman got in the rear seat.  In other words, the door was closed.  Gleckman opened the door and got in the vehicle with the subject.  Myself, I went over to the other side and got in the passenger's side in the front."  *Id.*, 55–56.

[18] Although Officer Gleckman testified that the captain told him not to interrogate, intimidate or coerce respondent on the way back, *id.*, at 46, this does not rule out the possibility that either or both of them thought an indirect psychological ploy would be permissible.

[19] In his article quoted in n. 12, *supra*, Professor White also points out that the officers were probably aware that the chances of a handicapped child's finding the weapon at a time when police were not present were relatively slim.  Thus, he concluded that it was unlikely that the true purpose of the conversation was to voice a genuine concern over the children's welfare.  See 17 Am. Crim. L. Rev., at 68.

statements made within Innis' hearing were as likely to elicit a response as a direct question. However, even if I were to agree with the Court's much narrower standard, I would disagree with its disposition of this particular case because the Rhode Island courts should be given an opportunity to apply the new standard to the facts of this case.