875 F.2d 863
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Steven CORT, Petitioner-Appellant,
v.
Al PARKE, Warden, Respondent-Appellee.
 No. 88-5923.
 United States Court of Appeals, Sixth Circuit.
 May 9, 1989.
 
 Before NATHANIEL R. JONES, WELLFORD and RALPH B. GUY, Jr., Circuit Judges.
 PER CURIAM.
 
 
 1
 Petitioner, Steven Cort, appeals from the denial of his 28 U.S.C. Sec. 2254 petition for habeas corpus. Cort had been convicted in Kentucky state court of wanton murder, accomplice to second degree burglary, and accomplice to theft by unlawful taking. These convictions were appealed through the Kentucky court system and were affirmed. In his state court appeals, Cort argued that certain statements made by him should not have been admitted into evidence. In his habeas petition, he made the same argument.
 
 
 2
 After receiving a report from a magistrate recommending denial of Cort's petition, the district court concluded that no error had occurred in admitting the challenged statements into evidence. We agree and affirm.
 
 I.
 
 3
 On the day of the murder, Cort, who was fifteen years old, and the victim, Elliot Ellis, were at the home of Keith Samuels. Cort and Ellis left, committed a burglary, and then returned to Samuel's house with the items taken in the burglary. Samuels asked both Cort and Ellis to leave, but they refused and began drinking. A dispute arose over how to divide the proceeds of the burglary, and knives were drawn. Samuels broke up the argument and Ellis put down his knife. Shortly thereafter, the dispute flared up again and this time, Cort, who now had Ellis' knife as well as his own, began repeatedly stabbing Ellis and then kicked him after he fell to the ground. Ellis eventually died from the stab wounds.
 
 
 4
 After the stabbing, Samuels went to summon assistance and returned with the victim's brother. The brother asked Cort why he had done this, and Cort replied, "I meant to do this." The police also had been summoned, and officers Neeley and Towles responded. After learning what had occurred, they went in search of Cort and found him nearby. Concerned that Cort was still armed with the knives, the officers drew their guns and told Cort to put up his hands. Cort did not initially comply. The officers approached Cort and, after a brief struggle, subdued him. As Officer Towles was handcuffing Cort, Cort said something to the effect that you don't have to hassle me. Towles replied, "Look, you just stabbed a young man up [the] street, up here, and he's probably going to die." (App. 72). Cort responded that Ellis deserved to die and that he should not have been hassling Cort. The officers then took Cort to the police cruiser where he was formally given his Miranda[1] rights. Cort repeatedly interrupted during the reading of his Miranda rights to say he knew his rights. During the ride to the police station, Cort made a request for an attorney.
 
 
 5
 Some time after Cort had been taken to the police station, Elliot Ellis died. Upon receiving this information, Detective John Thurston went to the room where Cort was being held. At that time, Cort's mother and grandfather were seated with him in the children's services section of the detective bureau. Detective Thurston told Cort that Elliot Ellis had died, and the charge against him was murder. Cort's response was, "So what the fuck else?" Cort argues that the statement he made to the officers while being handcuffed and the statement he made to Detective Thurston after being informed of the death of Ellis should have been suppressed.
 
 II.
 
 6
 There is no dispute that the statement made by Cort while he was being handcuffed was made prior to his being read his Miranda rights. However, statements made to police officers by suspects only run afoul of Miranda if the suspect was in custody and the incriminating remark was in response to a question which the officers knew or reasonably should have known was likely to elicit an incriminating answer. Rhode Island v. Innis, 446 U.S. 291 (1980). Petitioner spills a good deal of ink arguing that he was, in fact, in custody when he made the statement in question. This is really a straw man argument, however, because both the Kentucky Supreme Court and the federal district court found him to be in custody. We agree.
 
 
 7
 Cort also argues that, under the definition given to"interrogation" in Innis, the statement made to Cort by Officer Towles while Cort was being handcuffed was the "functional equivalent" of custodial interrogation. Id. at 301. We disagree. To the degree that the statement made by Officer Towles involved "functional equivalents," it was the functional equivalent of telling Cort why he was being arrested and explaining why he was being "hassled" by drawn guns and handcuffs. Cort reads Innis and related cases far too broadly. As the Court stated in Miranda, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478.
 
 
 8
 As to the exchange with Detective Thurston, it is Cort's contention that since he had asked for counsel, all future communications to him should have been through counsel. Edwards v. Arizona, 451 U.S. 477 (1981). We find this reading of Edwards far too expansive. Cort was in a juvenile holding area with his mother and grandfather when Detective Thurston informed him that Ellis had died. The death of Ellis would change the offense with which Cort would be charged, and was certainly information about which the parents of a juvenile should be made aware. There is nothing in the record to indicate that Thurston sought a response or that in any way this was intended as interrogation. No better proof of this is to be found than from Cort's own version of what occurred. At trial, Cort testified relative to the Thurston encounter as follows:
 
 
 9
 Then I think it was John Thurston, he came in there and he said, uh,--he said--He said, Steve, he said--he said, Ellie is died; Elliott's died, you know.
 
 
 10
 And I--I felt like I--I just, you know. You know, I--I felt like I--I turned white or something, you know. And I was--I kept--I kept looking at him like he had something else to say, because he said Elliott had died, you know. And, I was saying--You know I was thinking that he was going to say that Elliott died, but he'll be all right, you know, you know.
 
 
 11
 And, then I--then I--it all kept--one--You know I was expecting him to say something else 'cause I--I didn't believe that. And I was thinking--I said--I was trying to say, so what else, you know, and I said, so--so what and he--And then my mother or my grandfather they said, Steve, Steve, your mouth's going to get you in trouble, you know.
 
 
 12
 (App. 157-58; Trial Transcript 594-595).
 
 
 13
 Since we find no error in the admission of the challenged statements, it is not necessary to make a "harmless error" analysis. We do note in passing, however, that the evidence against Cort, primarily through the eyewitness testimony of Samuels, was overwhelming. We also note that there was significant other evidence of the "wanton" nature of the murder committed apart from any statements made by Cort while in custody.
 
 
 14
 AFFIRMED.
 
 
 
 [1]
 Miranda v. Arizona, 384 U.S. 436 (1966)