UNITED STATES of America

v.

Avaughn Bernard GREEN, Defendant.

Crim. A. No. 91–0462.

United States District Court,
District of Columbia.

Oct. 28, 1991.

Robert C. Little, Asst. U.S. Atty., Washington, D.C., for the government.

Douglas J. Wood, Riverdale, Md., for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This case is before the Court on defendant, Avaughn Bernard Green's ("Green") motion to suppress physical evidence and statements obtained on July 16, 1991 by officers of the Metropolitan Police Department. Because I find that the officers acted legally in seizing the physical evidence, the defendant's motion to suppress that evidence is denied. However, because the police did not properly inform the defendant of his *Miranda* rights, the defendant's motion to suppress statements is granted with respect to those statements made before he was read his rights.

## FINDINGS OF FACT

On October 15, 1991 this Court held a hearing on defendant Green's motion to suppress tangible evidence and statements made by him in connection with his arrest on July 16, 1991. In connection with that arrest Green was subsequently charged with possession with intent to distribute crack cocaine. At the hearing, testimony was taken from the defendant and two of the arresting officers, Officer Joe Crespo and Officer Gilbert Burgess. The following facts emerge.

At approximately 6:20 p.m. on July 16, 1991, Officer Joe Crespo was on foot patrol near the intersection of Wisconsin Avenue and M. Street in the Georgetown area. Although Officer Crespo was patrolling alone, there were several other officers on foot patrol in the same area. Officer Crespo observed a grey Samurai car make an illegal left turn from Prospect Street onto Wisconsin Avenue and proceeded to motion the car over to the curb.

The driver of the car was Nathaniel Wilson, and Green was riding in the passenger seat. The car was owned by Green's mother, who had given him permission to use it. Officer Crespo asked the driver for his license and the car's registration. The driver could not produce a license but handed the officer an identification card. Green then reached into the glove compartment, using his shoulder to shield the officer's view, and got the vehicle's registration. Green handed the registration to Wilson who gave it in turn to Officer Crespo. At that point Officer Todd Avis arrived on the scene and stood behind the car, preventing it from leaving.

After a radio call, it was determined that the driver, Wilson, did not have a valid driver's license. It had been suspended. Operating pursuant to MPD General Order §§ 303–1(I)(B)(1)(d), the officers decided to make a summary arrest. Officer Burgess, the transport driver, who had been called to the area on another matter, arrived on the scene. Wilson was arrested at that point. The officers also decided to search the car incident to Wilson's arrest and asked defendant Green to get out of the car. Green exited the car and stood on the curb, next to the car. One officer searched the car and another stood next to Green. In the glove compartment, the officer found a clear medicine bottle which contained a white rock-like substance which later proved to be crack cocaine.

At that point the officers placed Green on the sidewalk and asked him who owned the suspected drugs. Green did not respond. The police again asked who owned the drugs, and stated that if they were not his then they would presume the drugs belonged to his mother, the owner of the automobile. Green responded that the drugs belonged to him. He was handcuffed and placed in the transport vehicle. While being transported to the station Green reiterated that the drugs belonged to him, not Wilson or his mother.

During that entire time, no one gave Green a *Miranda* warning. He was only advised of his rights at the station. At that point he consented to waive his rights. Green then reiterated that the drugs were his, not Wilson's, and stated that he had gotten them on Rhode Island Avenue. He also said that he planned to sell them to make money. When asked to make a written statement, Green declined to do so until he had retained a lawyer. The questioning ceased at that point.

## DISCUSSION

### A. The Seized Drugs

■ Defendant Green first moves to suppress the narcotics seized from his mother's car. In support of his motion, Green argues that the car was not actually, nor under police regulations should it have been, impounded. That argument, however, fails to address the justification for the search.

■ "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident to that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). In *Belton* the Court upheld a vehicle search

which included unzipping a pocket of a jacket in the car's passenger seat after all of the car's occupants were removed and placed under arrest. There is no requirement under *Belton* that every occupant must be placed under arrest before a search incident to arrest may occur. The search of the vehicle in the present case was conducted incident to Wilson's arrest, not Green's. Since the validity of Wilson's arrest is uncontested, the search of the passenger area of the car was justified.

### B. Green's Statements Before He Was Mirandized

Green also argues that the statements he made at the scene and in transit to the station ought to be suppressed. Green argues that because he was not read his *Miranda* warnings before these statements were made, his Fifth and Fourteenth Amendment rights would be violated by their admission at his trial. The Government responds that because these statements were not obtained in the context of "custodial interrogation," that there was no need to *Mirandize* the defendant until his arrival at the station.

### 1. Custody

█ In determining when a person is in custody for purposes of receiving *Miranda* warnings "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCartny*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). In *Berkemer* the Court refused to set out a blanket rule that all traffic stops resulted in "custody." In leaving this determination to trial courts, however, the Court expressly noted that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id*. at 440, 104 S.Ct. at 3150. Under an objective determination, Mr. Green was in custody "for practical purposes."

There were at least three officers on the scene when Mr. Green was asked to stand on the curb. One of them was standing immediately next to him. Another had just formally arrested the driver. The third was conducting a thorough search of the defendant's car. From the outset, then, this was far more than a run-of-the-mill traffic stop. Subsequently, the search produced a clear medicine bottle in the passenger compartment which contained a substance the officers correctly believed to be narcotics. The police at that point physically restrained the defendant. He was held on the ground by a police officer. No reasonable person could argue that at that moment the defendant could simply have gotten up off the pavement, turned his back on the car and the three officers, and walked away. Indeed, it would have been poor police work to allow the defendant to walk away at that time. The Court finds that Green was in custody at the point he was placed on the ground.

### 2. Interrogation

█ A person in custody is entitled to *Miranda* warnings if he is "subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Thus, a person must be advised of his *Miranda* warnings when there are "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301, 100 S.Ct. at 1689–90. Since both "express" interrogation and its equivalent took place before Green arrived at the police station, his remarks until that time must be suppressed.

Upon finding the medicine bottle, the police asked Mr. Green whose it was. Mr. Green remained silent. Dissatisfied with that reaction the police officer put the same question again. This time, however, he added the comment that if the narcotics did not belong to Green they must belong to his mother. Because the car was registered in his mother's name, it was reasonable for Green to perceive this comment as an indirect threat to his mother. Facing this coercive pressure, and surrounded by police officers, Green responded to the question. While it is not beyond the power of the police to use such an aggressive

form of interrogation, it is beyond the pale of argument to say that it is not "interrogation" at all. The police twice put a direct question to Green, the answer to which could reasonably have elicited an incriminating response. Mr. Green was entitled to know, at the time of that questioning, that the Constitution guaranteed him the right not to answer.

Moments later, in transit to the station, Green repeated that the drugs belonged to him. This later comment was not "blurted out" as the government claims. It was a continuation of his response to the earlier interrogation. This is made clear by the fact that Green's statement was made in the form of a denial that the drugs belonged to someone else—the substance of the earlier police accusation. It was only when Green reached the station that he was properly informed of his *Miranda* rights. Accordingly, it was only his statements at that time that are admissible against him at his criminal trial. Defense counsel concedes this point and has not moved to suppress Green's statements after he was *Mirandized.*