UNITED STATES of America,

v.

Navarro A. HAMMOND, Defendant.

Crim. No. 92–0471.

United States District Court,
District of Columbia.

March 30, 1993.

Shawn Moore, Washington, DC, for defendant.

## MEMORANDUM

JUNE L. GREEN, District Judge.

This action is before the Court upon the defendant's Motion to Suppress Tangible Evidence and Statements. At the March 29, 1993 hearing on the motion, the Government examined several witnesses in an effort to establish that the defendant's statements made while in custody were voluntary and pursuant to a valid waiver of his constitutional rights. The defendant testified on his own behalf. For the reasons stated below, the Court finds that the defendant's written and oral statements made while in police custody were obtained in violation of his constitutional rights. Accordingly, the Court suppresses the defendant's oral and written statements.

The Court denies, however, the defendant's motion to suppress tangible evidence. Although the defendant claimed in his motion papers that the affidavit upon which the search warrant was issued contained false and misleading facts, the defendant failed to substantiate these claims with sufficient proof to warrant an evidentiary

inquiry under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Furthermore, the Court credits the testimony of Detective Carl Gregory in his affidavit in support of the search warrant and finds that the affidavit demonstrated probable cause for the requested search warrant.

## FACTS

On July 10, 1992, at approximately 8:30 a.m., members of the FBI and the Metropolitan Police Department (MPD) executed an arrest warrant for the defendant, Navarro A. Hammond, because he had been indicted for the murder of D.C. corrections officer Ronald Richardson. The police officers arrested the defendant in the parking lot adjacent to 1418 Howard Road, S.E., in the District of Columbia. The defendant is recorded as a lessee of apartment # 104 at that address which is also the apartment of his girlfriend or fiance, Annette Middleton, the mother of his daughter.

The defendant was put in handcuffs and transported to the homicide branch of the MPD at about 9:12 a.m. where he was placed in a small interview room and handcuffed to the floor. At about 9:54 a.m. a homicide detective named Carl Gregory entered the room and interviewed the defendant to obtain the defendant's biographical data. Thirty or forty minutes later, detective Gregory was summoned from the room and informed by detective William Hamann that the police had searched Apartment # 104 at 1418 Howard Road and recovered substantial quantities of crack, cocaine, heroin, and marijuana, as well as various dilutants and a scale. The two detectives conferred with Assistant United States Attorney Clifford Cronk who was also present. Mr. Cronk said that the quantity appeared to be "District Court weight" and that the minimum time for the defendant would be ten years. The three gentlemen decided that Detective Gregory should "advise" the defendant about the search and recovery of drugs. Detective Hamann and Mr. Cronk could view and listen to this conversation on a closed circuit television monitor.

Detective Gregory reentered the interview room and told the defendant that the defendant now had "a problem bigger than the homicide." Detective Gregory told the defendant about the drugs that had been found at 1418 Howard Road, # 104, and said "you're looking at 10 years." The detective challenged the defendant's earlier assertions that he did not know the number of his apartment at 1418 Howard Road and said that Mr. Navarro was recorded on the lease to apartment # 104. The Detective said that it "shone a bad light on Annette Middleton" and asked the defendant "what are you trying to tell me?" At this point the defendant hung his head and said "man, you know the drugs are mine." Detective Gregory then said he did not want to talk to him anymore, but that he would return to talk to him about anything the defendant wanted.

After conferring again with Mr. Cronk and Detective Hamann, Detectives Gregory and Hamann returned to the interview room with a PD47 *Miranda* rights card. Detective Gregory told Detective Hamann in front of the defendant that the defendant had "admitted it" and that Detective Gregory respected him for "being a man" and "stepping up" because the defendant had told him whose drugs they were without being asked. Detective Hamann "reiterated" what Detective Gregory had said and then he said "you and I know who the drugs belong to, it's up to you what you're gonna do." The defendant told the officers that he would talk about the drugs, but not about the homicide.

At this point, at about 10:46 a.m., the defendant was read his *Miranda* rights for the first time. Detective Hamann read the rights from the PD47 card, had the defendant read the contents of the card aloud, initial and sign the card. In addition, Detective Hamann wrote the word "drugs" on the back of the card to signify the defendant's understanding with the police officers that the interrogation would be limited to the drugs found at 1418 Howard Road. Thereafter, the detectives questioned the defendant who informed them of the precise locations and approximate value of the drugs in the apartment. Additionally, Detective Hamann testified that he questioned the defendant about other cases he was working on, including the homicide of Ronald Richardson, and

his association with other suspects in that case. Detective Hamann prepared a written statement and before having the defendant sign the statement, again read to the defendant his *Miranda* rights.

## DISCUSSION

At the hearing on the motion, both the government and the defense counsel acknowledged that the defendant was in custody when the police officers questioned the defendant. Mr. Hammond was handcuffed to the floor of an interview room at the MPD Homicide Branch. Unquestionably, he was "in custody or otherwise deprived of his freedom of action." *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966.)

■ The question for the Court to decide is whether or not Mr. Hammond was deprived of his constitutional right to protection against self-incrimination. Because the Court finds that the initial questioning by Detective Gregory was coercive, unwarned and self-incriminating, the defendant's oral and written statements must be suppressed. The Court finds that the defendant's statements made to Detective Gregory prior to his receipt of *Miranda* warnings must be suppressed. The Court further finds that the oral and written statements made by the defendant after he received *Miranda* warnings must be suppressed because the statements were not knowingly and voluntarily made in accordance with the requirements established by *Miranda* and its progeny.

In *Miranda*, the Supreme Court concluded that "unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Miranda*, 384 U.S. at 458, 86 S.Ct. at 1619. Here, the Court finds that no such protective devices were employed and that Mr. Hammond was coerced into confessing that the drugs in Apartment # 104 belonged to him.[1]

Detective Gregory entered the interview room and informed Mr. Hammond about the type and amount of drugs recovered, he then indicated that the potential penalty for this offense was a minimum of ten years. Detectives Gregory and Hamann told the defendant that "it shone a bad light on Annette Middleton," that *they* knew and *he* knew who the drugs belonged to, and then the detectives asked him what he wanted to do. Despite the police officers' testimony that the defendant thereafter "spontaneously" admitted that the drugs were his, the Court finds that the defendant's statements were the direct result of the not-so-subtle implications of the detectives' statements to the defendant. *See United States v. Green*, 776 F.Supp. 565, 567–568 (D.D.C.1991) ("Because the car was registered in his mother's name, it was reasonable for [the defendant] to perceive this comment as an indirect threat to his mother. Facing this coercive pressure, and surrounded by police officers, [the defendant] responded to the question."). Like the defendant in *U.S. v. Green*, it was reasonable for Mr. Hammond to perceive the detectives' statements as an indirect threat to his girlfriend, Annette Middleton, the mother of his daughter.

■ The government points to *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) to support its argument that even if the defendant's initial confession was involuntary and unconstitutionally obtained, the defendant's oral and written statements made after he was given his *Miranda* rights should not be suppressed because they were obtained pursuant to a valid waiver of his *Miranda* protections. The Court finds that *Oregon v. Elstad* does not help the Government. In that case, the defendant's initial admission was made in an uncoercive situation, prior to arrest, by a defendant who was only a "suspect" at the

1. At the hearing on the motion, the government argued that because Mr. Hammond had been arrested on several prior occasions, he was familiar with his rights. Although it is a factor to consider, the Supreme Court makes clear in *Miranda* that "The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege is so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given." *Id.* at 468, 86 S.Ct. at 1625.

time. Here, Mr. Hammond was under arrest for murder, in the custody of homicide detectives and handcuffed to the floor of a small interview room. These custodial conditions, coupled with the manipulative statements made to the defendant preclude any argument that this defendant confessed in an uncoercive environment. *Cf. Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (Supreme Court held that the suspect in this case was not subject to custodial interrogation when police officers talked between themselves in the suspect's presence and then the suspect, on his own initiative, confessed to the location of a murder weapon.).

The Court finds that the defendant's statements subsequent to his waiver were not "voluntary in the sense that [they were] the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987).

## *CONCLUSION*

Pursuant to the reasons stated above, the Court grants the defendant's motion to suppress all his oral and written statements. Furthermore, the Court denies the defendant's motion to suppress the tangible evidence. An appropriate Order accompanies this Memorandum.

## *ORDER*

Upon consideration of defendant's Motion to Suppress, the government's opposition, the supplemental memoranda submitted by the government and the defendant, and the March 29, 1993 hearing on the motion, it is by the Court this 30th day of March, 1993

**ORDERED** that the defendant's motion to suppress physical evidence and statements is granted in part and denied it part; it is further

**ORDERED** that the oral and written statements of the defendant are suppressed; and, it is further

**ORDERED** that the physical evidence is not suppressed and is admissible at trial.