Argued and submitted June 18, reversed and remanded December 1, 1982

# STATE OF OREGON,
*Respondent,*

*v.*

# JAMES MICHAEL FITZGERALD,
*Appellant.*

(No. 21-211, CA A23509)

653 P2d 1289

J. Marvin Kuhn, Chief Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Robert E. Barton, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Defendant appeals his convictions for burglary and theft. He contends that the trial court erred in denying his motion to suppress statements he made in response to questioning by the police while he was in custody and after he had requested counsel. The issue is whether defendant's *Miranda* rights were violated. We conclude that they were and reverse.

About 10 p.m., on October 6, 1981, Officer Ferraris was dispatched to a store in Beaverton. On arriving at the store, he was informed that at 8:15 p.m. defendant had been detained by store employes for theft. Ferraris advised defendant of his *Miranda* rights and asked him if he was willing to answer questions. Defendant replied, "I want a lawyer."

Ferraris continued questioning defendant. At the suppression hearing, Ferraris testified that he did so in order to establish defendant's identity. Defendant then told Ferraris that his name was Wayne Elroy Dagett, that he lived at 2675 S.W. Gilbert in Portland and that his telephone number was 646-8386. That data was consistent with that previously given by defendant to store employes. At the time of his arrest, defendant had several credit cards in his possession in the names of W. E. Dagett, Wayne E. Dagett, Wayne Elroy Dagett and Alfred Carr. Ferraris suspected that the cards might have been stolen, and from the outset he had doubts about defendant's true identity. Also, at the time of his arrest, defendant was carrying a. 22 caliber derringer, and Ferraris suspected that he might be trying to conceal his true identity in order to evade a charge of ex-convict in possession of a firearm.

Shortly thereafter, Detective Loper arrived at the store, and he assisted Ferraris in the investigation. About 11:00 p.m. Ferraris and Loper took defendant to the Beaverton police station, where they attempted to question him further. Defendant again requested to see a lawyer. Ferraris checked a telephone book and found the name of a Wayne E. Dagett at 1765 S.W. Warwick in Portland with a telephone number of 644-2353. Ferraris asked defendant to repeat his address and defendant said it was 2765 S.W. Warwick and that his telephone number was 646-6353.

Defendant explained that he gave the store a false address, because he believed he would be released and "he thought he could skip the charge because it was a phony address." Next, Ferraris talked to Alfred Carr. He stated that his credit card had been stolen in a recent burglary. Ferraris verified that a burglary report had been made by Carr to the police.

Ferraris and Loper persisted in demanding that defendant give them additional information to verify his identity. Defendant then said that he was really Wayne Dagett, Jr., that he lived with his parents who were at home and that the police could telephone them to verify his identity. When Ferraris telephoned the Dagett residence, there was no answer. Defendant then said that his parents were in Reno. When asked for directions to the Dagetts' house, defendant gave the officers explicit directions that indicated he was familiar with the area.

Detective Loper then took a photograph of defendant to the Dagetts' neighborhood. A neighbor told Loper that the photograph was not of the Dagetts' son. The neighbor, who had been asked by the Dagetts to watch their house while they were on vacation, let Loper into the house, which evidenced a recent burglary. In the house, Loper found a note that detailed the Dagetts' itinerary to Reno. He also talked to the Dagetts' son, who lived in the area. Loper then telephoned Ferraris and informed him of his findings. According to Loper, defendant "very obviously, was not Mr. Dagett."

Back at the police station, and despite defendant's repeated requests for a lawyer, Ferraris continued to question defendant. Ferraris testified:

"Q * * * After Mr. Loper had left, was there any further conversation between you and Mr. Fitzgerald?

"A Yes, there was.

"Q And what was that?

"A Well, I basically told him that I didn't believe it, nothing that he had told me checked out, as far as I could tell, and I just did not believe the man. He couldn't show me anything to verify his identity and I told him that. He disagreed with me and stuck to his story. I kept asking him who he was. Then he said — *he kept demanding his lawyer.* * * *

"* * * * *

"Q   There was a mention in your report that you asked him, 'I gave him several opportunities to provide me with names of friends or acquaintances that we could contact to verify his identification.' Is that a true statement in your report?

"A   Yes.

"Q   How many times did you ask him that?

"A   Oh, I couldn't even count. It was a very intense conversation. I kept asking him, 'Give me a name. You know, I'm giving you an opportunity. Give me a name.' He couldn't give me anything. This went on for quite awhile. I gave him every opportunity in the world to identify himself as far as procedure went and he couldn't do it." (Emphasis supplied.)

About 2 a.m., defendant was permitted to call a lawyer. Ferraris sat a few feet away during that call, and he heard defendant tell the lawyer that he had obtained the credit cards from a black man at Washington Park and that he did not know that they were stolen. After defendant had talked with the lawyer, Ferraris continued questioning him. He then said that his name was James Michael Dolan. Ferraris determined that there was a Seattle warrant for Dolan and that James Michael Dolan was a known alias for James Michael Fitzgerald. At 4:01 a.m. defendant was booked at the Washington County Jail. Later, he was charged with the burglary of the Dagetts' home and the theft of Mr. Dagett's derringer. At the trial, evidence of defendant's familiarity with the exact location of the Dagetts' home and of defendant's knowledge that the Dagetts were on a trip to Reno was offered by the state.

At the conclusion of the *Miranda* hearing, the trial court found that both Ferraris and Loper were credible witnesses, that the motive of the officers in questioning defendant was to identify him, and that when Loper indicated that there was a possibility of further charges, he meant "that whenever there is a continuing investigation, further facts can be found which may, in fact, lead to further charges." The court also found that defendant had a right to speak "privately" with counsel. The court suppressed evidence of any conversation between defendant

and his lawyer overheard by Ferraris but denied defendant's motion to suppress other statements made by him in response to questioning by the police.

The state concedes that defendant was in custody, that after being advised of his right to counsel he requested counsel and that this request was repeated during the subsequent questioning. The state makes no claim that defendant waived his right to counsel. It contends that the officers' inquiry was limited to ascertaining defendant's identity in the face of the conflicting and duplicitous information that he had provided to them. It argues that the fact that his responses were incriminatory was a product of his own voluntary decision to fabricate and was not a function of the nature and scope of the inquiry itself.

In *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981), the Supreme Court held that if, after being advised of his right to counsel, an accused person requests counsel, further interrogation must cease until an attorney is present. Within the meaning of *Miranda,* the term "interrogation" refers to express questioning and any other words or actions on the part of police, other than those normally attendant on arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis,* 446 US 291, 301, 100 S Ct 1682, 64 L Ed 2d 297 (1980). This definition focuses primarily on the perceptions of the suspect, without regard to objective proof of the underlying intent of the police. However, an officer may not cloak compulsion above and beyond that inherent in custody itself with the label "routine identifying information" and thereby circumvent the objectives of *Miranda.* In deciding whether police should have known that their actions were likely to elicit an incriminating response, we look to the nature of the questions asked, the length and intensity of the questioning, the time of day and other surrounding circumstances of which the police were aware.

On cross-examination, Ferraris testified that he was convinced defendant was not Wayne Dagett "[w]hen I first met him," that he understood that Carr's credit card had been stolen in a burglary and that Loper had gone to the Dagetts' house "to see if possibly a burglary had

occurred" and "[h]ow [defendant], who [he] didn't believe was Wayne Dagett, [got] these credit cards." Ferraris acknowledged that he did not know how long he would have kept defendant at the police station. When asked why he waited so long before permitting defendant to telephone a lawyer, he responded:

> "I really can't say. I wasn't asking him any questions that were pertaining to any criminal act. I was asking him questions about his identity and then he finally said he wanted an attorney and so I said, 'Okay, you can use the telephone. Go ahead.' I gave him the phone book."

Ferraris acknowledged that defendant had never waived his initial request for an attorney and had repeated his request while at the police station. He insisted, however, that his only purpose in the questioning was to determine his identity.

On cross-examination, Loper testified that, if he found someone with credit cards bearing different names, it would be "a reasonable suspicion that at least one of the credit cards was stolen." He also testified that, normally, when the Beaverton police arrest someone, they bring the arrestee to the police station for the booking procedure and that, if the police felt that additional crimes had been committed, "they would then delve into that if it were possible." Loper admitted that "in a sense" that in fact was what he and Ferraris were doing here:

> "* * * Again, we were trying to determine [defendant's] identity and were trying to determine if any additional crimes had been committed which would be in along the same lines as if [defendant] were giving us a false name."

We conclude that the continued questioning here, after defendant had requested counsel, did not constitute mere routine administrative questioning for booking purposes. The length, intensity and scope of Ferraris' questioning removes it from that category. Ferraris stated that the questioning was necessary to determine whether to jail or release defendant on his own recognizance. Yet, if the defendant's identity was suspect, he could have been jailed, permitted to see a lawyer as requested and thereafter allowed to determine for himself whether he chose to remain in custody or to give the police information satisfactory enough to gain his release on his own recognizance.

From the outset, both officers suspected that defendant might be involved in other crimes, *e.g.,* carrying a concealed weapon, exconvict in possession of a firearm, theft of credit cards and burglary. They knew or should have known that continued questioning was reasonably likely to elicit incriminating evidence. We conclude that under the totality of the circumstances, the extensive questioning of defendant by the police constituted "interrogation" and that the police violated defendant's *Miranda* rights. Accordingly, the trial court erred when it denied defendant's motion to suppress.

Reversed and remanded for a new trial.