Argued and submitted December 29, 1986, reversed and remanded July 22, reconsideration denied September 11, petition for review denied October 6, 1987 (304 Or 240)

STATE OF OREGON,
*Appellant,*

*v.*

DANIEL P. ONUSKANICH,
*Respondent.*

(C86-02-30782; CA A40488)

739 P2d 1062

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for respondent. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

YOUNG, J.

## YOUNG, J.

Defendant was charged with being an ex-convict in possession of a firearm. ORS 166.270. The state appeals from an order dismissing the indictment and from an order suppressing defendant's statements. The order of dismissal was entered after the state was unable to proceed with the prosecution because of the suppression of the statements. The issue is whether defendant's *"Miranda* rights" were violated.[1] We reverse.

In February, 1986, Deputy Schneider and another officer went to defendant's apartment with a warrant for his arrest. The deputy knocked, and defendant opened the door a few inches. The deputy called him by name, announced his authority and told him that he was under arrest. Defendant tried to close the door. The officers pushed the door open, pinning him behind it. When they released the pressure on the door, defendant was slumped to the floor and a revolver was lying on the floor near his hands. The officers handcuffed defendant, and the deputy asked him where his brother was. Defendant said that he was in prison. The officers were surprised to discover that there were five or six people in the apartment.

The officers were soon assisted by other officers. While two "secured" the apartment and "contacted" four people in the back bedroom area, Schneider and another officer stayed near the front door to guard defendant and another handcuffed man, to provide cover for the other officers and to watch the front door. Defendant then asked the deputy whether he would read him his rights. The deputy responded, "No, I'm not reading you your rights right now, because I'm not asking you any questions." The deputy also asked defendant whether he remembered his rights from last time, and defendant said that he did.

The deputy testified that after about five minutes it became evident that the apartment was secure, and he turned

---

[1] Defendant's motion to suppress relies on the federal and state constitutions. The Oregon Supreme Court has held that Article I, section 12, affords a defendant no greater protection than does the Fifth Amendment, *see State v. Smith,* 301 Or 681, 725 P2d 894 (1986); *State v. Sparklin,* 296 Or 85, 672 P2d 1182 (1983), when considering an accused's *Miranda* rights. Therefore, we need not discuss whether state law affords greater protection than the Federal constitution.

his attention to his immediate surroundings. At that point, defendant asked whether he had the right to defend himself. The deputy responded, "Well, your right to defend yourself depends on the circumstances." The deputy testified that he did not intend to elicit any conversation from defendant. Defendant then volunteered that he was in fear for his life from a drug dealer and another person and that he had armed himself with the revolver. The deputy testified that defendant's statements were not in response to any questions.

The deputy testified as to what occurred some minutes later:

"A: [Defendant] stated he knew his Rights, and then he stated his Rights as best he knew them, and he indicated that he knew he had a right to remain silent, and that he knew he had a right to have an attorney present during any questioning. And then he said that the State will provide an attorney for me, and if he — free of charge. And then, so at that point, I said, 'Well, that's not exactly right,' and I read him the last two, which says that he had the right to have an attorney with him during any questioning, and if he cannot afford an attorney, one will be provided for him free of charge, if he wants one.

"Q: But the first Rights, the right to remain silent, and anything he says can and will be used against him, he repeated that verbatim to you?

"A: Yes, that is correct.

"Q: Now, after that, did he also make another statement again about his involvement in the possession of this gun that you had seized?

"A: Well, he did, he indicated that, again, that he believed he had a right to arm himself. I asked him if he knew it was wrong to possess a gun, and he said he believed he had a right to arm himself to protect himself."

Defendant testified that he had said that he understood his rights but that he did not know what he was saying, because he was high on cocaine. The trial court granted defendant's motion to suppress all statements attributed to him.

The state concedes that defendant was in custody from the moment that he was handcuffed. The officer first asked where defendant's brother was. Because the officer did

not first recite the *Miranda* rights, the court suppressed defendant's answer to that question. Because the state does not seek the admission of that response, that question is relevant only if it renders defendant's subsequent statements inadmissible.

Defendant's first admission concerning possession of a firearm was preceded by two other verbal exchanges with the officer, both of which defendant initiated. He asked if the officer would read him his rights, to which the officer said no, because defendant was not being questioned. Five minutes later, defendant asked whether he had the right to defend himself. The officer responded that defendant's right to defend himself depended on the circumstances. Defendant then stated that he was in fear for his life and that he had armed himself with a revolver.

■ The procedural safeguards outlined in *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), are required when a suspect in custody is subjected to interrogation; if there is no interrogation, there is no need for the warnings. *Rhode Island v. Innis,* 446 US 291, 300, 100 S Ct 1682, 64 L Ed 2d 297 (1980). "Interrogation"

> "refers not only to express questioning, but also to any words or actions on the part of the police * * * that the police should know are reasonably likely to elicit an incriminating response * * * from the suspect. * * * The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. * * * A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. * * * But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." 446 US at 301. (Emphasis in original; footnotes omitted.)[2]

Whether the police should have known that their actions were likely to elicit an incriminating response depends on "the

[2] We adopted that definition of interrogation for purposes of state constitutional analysis. *See State v. Bradbury,* 80 Or App 613, 616 n 1, 723 P2d 1051, *rev den* 302 Or 342 (1986).

nature of the questions asked, the length and intensity of the questioning, the time of day and other surrounding circumstances of which the police are aware." *State v. Fitzgerald,* 60 Or App 466, 471, 653 P2d 1289 (1982).

■ The officer's response to defendant's request for his *Miranda* rights was simply that they were not required, because defendant was not being interrogated. In addition, the officer's response to defendant's question about his right to defend himself cannot reasonably be viewed as seeking a response. The officer's answers to defendant's questions were not intended to and did not produce defendant's later statements. There was no interrogation.

■ The question which the officer had asked earlier about defendant's brother does not make defendant's pre-*Miranda* incriminating statement concerning the revolver the product of interrogation, nor did it taint the subsequent confessions. A change, or "the 'break in the stream of events,' should be sufficient to insulate the statement from all that went before." *State v. Mendacino,* 288 Or 231, 237, 603 P2d 1376 (1979), *quoting Clewis v. Texas,* 386 US 707, 710, 87 S Ct 1338, 18 L Ed 2d 423 (1967). The circumstances under which defendant talked about the revolver were very different from the earlier violent encounter when defendant was asked about the whereabouts of his brother. We conclude that the coercive effects of the prior encounter were effectively removed.

■ Before defendant's next incriminating statement with respect to the revolver, he stated that he knew his rights and stated two of them verbatim. The officer read defendant the remaining rights concerning his right to counsel but did not read the rights which defendant had already stated verbatim. Defendant was adequately informed of his Miranda rights.

The next issue is whether the prosecution carried its burden of demonstrating a knowing, intelligent and voluntary waiver. *See State v. Corona,* 60 Or App 500, 505, 655 P2d 216 (1982). Whether defendant actually understood the rights is an historical fact, and we are bound by the trial court's finding, if it is supported by the record. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). The trial court, however, made no finding on this issue, and we cannot fairly infer from the court's statement

"now I hear the defendant testifying that he was under the influence of drugs, and he did indeed blurt out a couple of his rights,"

a finding that defendant did not understand his rights, especially in view of the fact that he demonstrated specific knowledge of two of them.

■     More difficult is whether defendant's waiver of his rights was voluntary. The analysis of the voluntariness of a confession and the voluntariness of a waiver of rights is the same. *State v. Foster,* 288 Or 649, 655, 607 P2d 173 (1980). However, the court made no relevant findings. We must remand for findings of fact on that issue. If the court finds that defendant did not waive his rights, or that any of the statements made was involuntary, it shall enter an appropriate suppression order; otherwise, the statements are not inadmissible on these grounds.

Reversed and remanded for proceedings not inconsistent with this opinion.