Submitted on record and briefs September 25, 1989, judgment vacated and remanded for further proceedings February 14, reconsideration denied May 16, petition for review denied July 3, 1990 (310 Or 133)

## STATE OF OREGON,
*Respondent,*

*v.*

## DANNY L. DOREY,
*Appellant.*

(87-2746-B-C-2; CA A49570)

786 P2d 1288

Howard W. Collins, Salem, filed the brief for appellant.

Dave Frohnmayer, Attorney General, Virginia L. Linder,

Solicitor General, and David Runner, Assistant Attorney General, Salem, filed the brief for respondent.

Before Graber, Presiding Judge, and Riggs and Edmonds, Judges.

GRABER, P. J.

## GRABER, P. J.

A jury convicted defendant of criminal conspiracy, robbery in the first degree, and felony murder. ORS 161.450; ORS 164.415; ORS 163.115(1)(b)(G). He appeals, assigning as error the denial of his motion to suppress. We vacate the judgment and remand.

The trial court did not, as it should have, make findings of historical fact. *State v. Wise,* 305 Or 78, 81-82, 749 P2d 1179 (1988). The facts that we state are undisputed, unless we note otherwise.

In the early morning hours of September 10, 1987, two men robbed a gas station. During the robbery, one of them shot and killed a store clerk. A .303 caliber bullet was recovered from the clerk's body. Two days later, defendant pawned a .303 caliber rifle, giving his name and address to the pawn shop. Officers Millard and Lloyd went to that address on September 21, 1987, to talk with defendant. A roommate told the officers that defendant had been arrested earlier that day for driving while suspended and was in jail. Millard and Lloyd then went to the jail.

At about 10:40 a.m., the officers began questioning defendant.[1] First they verified his name and address and confirmed that he had pawned the rifle. They asked how long he had owned the rifle; he said that he was not sure when he had bought it but that his purchase had been recent. Defendant described the person from whom he had acquired the rifle. Lloyd then told him that the officers were investigating the weapon that he had pawned in connection with a robbery and homicide and asked, "Hypothetically, what can you tell me about this thing?" Defendant answered that he could tell them anything that they wanted to know, because he had been there.

At that point, Lloyd read *Miranda* warnings from a

---

[1] The evidence is in conflict concerning the circumstances of the questioning. Defendant testified that he was awakened and taken out of his cell shortly after having gone to sleep. Millard testified that he and Lloyd took defendant from a line of prisoners who were in the booking area of the jail, awaiting arraignment. Defendant testified that he had not slept much during the 24 hours before the interview and that he had smoked marijuana and taken methamphetamines on the day and evening before the interview. The officers testified that they noticed nothing in defendant's demeanor to suggest that he was intoxicated, "hung-over," or otherwise impaired.

card and had defendant read the card. Defendant said that he understood his rights and, at about 11 a.m., he and Lloyd signed the card. The officers testified that they had not considered defendant to be a suspect until then, because they did not think that anyone involved in the crime would have pawned the weapon so soon afterward or, particularly, would have done so using his correct name and address. Between 11 a.m. and 11:29 a.m., the officers questioned defendant about the crime.[2] Beginning at 11:29 a.m., he gave a taped statement for about half an hour. At the beginning of the tape, Lloyd repeated the *Miranda* warnings, and defendant again said that he understood his rights and had agreed to give a statement.

After the taped interview, Lloyd, Millard, and defendant went to defendant's home and spoke with several people who lived there. The officers obtained statements that incriminated defendant, and they recovered the shell casing from the bullet that defendant said had killed the store clerk. They then returned with defendant to the jail and booked him on charges of criminal conspiracy, robbery, and murder.

The next day, defendant re-enacted the crimes at the gas station on videotape. He was again advised of his *Miranda* rights before the taping began, and he expressly agreed to make the tape. On the way back to the jail, he showed the police where two stocking masks, that had been used in the robbery, had been discarded. Inside the masks were hairs that matched samples later taken from defendant and another person. Defendant also led the police to the getaway car, which had been traded in for another car, and to a baseball bat that he had used as a weapon during the robbery. It was in a car at defendant's house.

Defendant moved to suppress his statements on two grounds. He argued that the officers had obtained statements without having first advised him of his rights under Article I,

---

[2] The record contains inconsistent accounts of what happened. Defendant testified that the officers told him that, if he had not pulled the trigger, he would not be charged with murder but only with robbery. Millard testified that he told defendant that he "would be charged if he was involved with the robbery and also the murder." Lloyd testified that he said, "You won't hang for something you didn't do." Furthermore, defendant stated, but the officers denied, that they made promises to him about how he would be treated if he were to cooperate.

section 12, of the Oregon Constitution. In addition, he contended that his statements were involuntary, because he was sleepy, was placed in a physically intimidating environment, and was misled by police promises. The trial court denied the motion in a written order. Defendant renews both arguments on appeal.

■ Defendant bases his first argument on Article I, section 12, of the Oregon Constitution. That provision requires *Miranda*-type warnings, at least when a suspect is in custody. *State v. Brown,* 100 Or App 204, 785 P2d 790 (1990).

In responding to defendant's state constitutional argument, the state relies on principles developed under the Fifth Amendment. It concedes that defendant was in custody but argues that warnings were required only if the police were intending to interrogate him as a person suspected of guilt in the crime under investigation. No Oregon case has considered whether Article I, section 12, requires warnings when the police question a person who is in custody for a reason unrelated to the crime under investigation and they question the person, not as a suspect, but only as a witness who may have pertinent information.[3] We find the reasoning of cases that have considered the issue under the Fifth Amendment helpful under Article I, section 12.

First, we agree with the state that, although defendant was in custody for another reason when he was questioned about the robbery and murder, he was in custody nonetheless. *See, e.g., Mathis v. United States,* 391 US 1, 88 S Ct 1503, 20 L Ed 2d 381 (1968). The next issue is whether he was being questioned as a suspect. The state contends that he was not a suspect until he said that he had been at the scene of the crimes. Defendant counters that he was a suspect from the time when the police learned that he had pawned the rifle and that the use of a "hypothetical question" was "camouflage."

The trial court made no findings to resolve the question of when defendant became a suspect. If he was not a

---

[3] In *State v. Smith,* 301 Or 681, 725 P2d 894 (1986), the defendant was not a suspect and was not in custody. In *State v. Vu,* 307 Or 419, 770 P2d 577 (1989), the defendant was a suspect but was not in custody. The court held in each instance that Article I, section 12, did not require warnings. In *State v. Magee,* 304 Or 261, 744 P2d 250 (1987), the defendant was both a suspect and in custody; in that situation, the court held, warnings were required.

suspect until he told the police that he had been present during the crimes, *Miranda* warnings were not required earlier. If he waived his rights, and if his statements were voluntary, all of the evidence was properly admitted. *See Boutwell v. State,* 256 Ga 63, 67, 344 SE2d 222 (1986); *Gaines v. State,* 404 So 2d 557, 560-61 (Miss 1981). The trial court must explicitly find the relevant facts and draw the appropriate conclusions on remand.

■■ If the court were to conclude that defendant was a suspect from the beginning, the next question would be whether the police were "interrogating" him. Interrogation means

> " 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.' "
> *State v. Bradbury,* 80 Or App 613, 616, 723 P2d 1051, *rev den* 302 Or 342 (1986), *quoting Rhode Island v. Innis,* 446 US 291, 301-02, 100 S Ct 1682, 64 L Ed 2d 297 (1980). (Emphasis in original.)

The questions that the police asked before they gave *Miranda* warnings were different from those that we have previously held not to be interrogation, such as identification and booking questions. *See, e.g., State v. Hlady,* 43 Or App 921, 607 P2d 733 (1979). Whether the police "should have known" that their actions were likely to elicit an incriminating response, and therefore amounted to interrogation, depends on "the nature of the questions asked, the length and intensity of the questioning, the time of day and other surrounding circumstances of which the police were aware." *State v. Fitzgerald,* 60 Or App 466, 471, 653 P2d 1289 (1982).

The officers knew that defendant had pawned a rifle that they believed was a murder weapon. They questioned him about the rifle in jail for about 20 minutes, including a question as to what he could tell them about the robbery and murder, before giving him *Miranda* warnings. If defendant was a suspect, those questions in that setting amounted to interrogation, because the police should have known that their actions were reasonably likely to elicit an incriminating response. Thus, if defendant was a suspect before he received *Miranda* warnings, then all statements that he made after he became a suspect, but before his rights were read to him for the first time, should have been suppressed.

If defendant's unwarned statements were given in violation of Article I, section 12, then the statements after the warning are admissible *if* his consent to talk after being advised of his rights was an intelligent, knowing, and voluntary waiver of those rights and *if* those statements were actually voluntary. *Oregon v. Elstad,* 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985); *State v. Elstad,* 78 Or App 362, 717 P2d 174, *rev den* 302 Or 36 (1986). There was conflicting testimony on whether defendant's statements both before and after the first warning were voluntary and on whether he voluntarily waived his rights, but the trial court failed to resolve the factual disputes. It must do so on remand and must apply the *Elstad* standards, if appropriate, to the facts that it explicitly finds.

Defendant next asserts that the physical evidence should be suppressed, because it was obtained as a result of his allegedly illegal confessions. The state responds that the physical evidence would have been discovered inevitably, so it is admissible, even if the statements are not. In order to prove that evidence would have been discovered inevitably,

> "[t]he prosecution must establish by a preponderance of the evidence: (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question." *State v. Miller,* 300 Or 203, 226, 709 P2d 225 (1985), *cert den sub nom Miller v. Oregon,* 475 US 1141 (1986).

The only "proper and predictable investigatory procedure" identified was that the police would have questioned

the people who lived at defendant's house. The police did not know about the retention of the shell casing until defendant told them that his former girlfriend had it. They then asked her about it. Whether they inevitably would have found the shell casing without defendant's statement to them is a question of fact for the trial court on remand. If so, then the shell casing is admissible without regard to the voluntariness of defendant's statements.

The analysis with respect to the getaway car is similar. Defendant led the police to the car. However, they also received tips about it from his friends. Whether the police would have located it without defendant's statements is a question of fact for the trial court to resolve on remand. If so, evidence about the car is admissible without regard to the voluntariness of defendant's statements.

■ The baseball bat that defendant seeks to suppress was found in a car at his house; defendant led the police to it. There is no evidence that anyone else at the house knew where the bat was, and there is no testimony that the police would have searched cars at the house. Similarly, the only evidence that the police had as to the location of the stocking masks came from defendant. Although there is testimony that defendant's girlfriend knew about them, there is no evidence that she knew where they were. Defendant's alleged accomplice knew where the stocking masks had been discarded, but nothing in the record suggests that he would have shown the police their whereabouts. The state failed to show that the bat or the masks would inevitably have been discovered. Their admissibility depends on the voluntariness of defendant's statements.

We vacate the judgment and remand for the trial court to make specific findings as required by this opinion and to decide, on the basis of the facts that it finds, whether all of defendant's statements were voluntary. If they were, the court shall re-enter the judgment. If they were not, then the court shall grant defendant a new trial, at which his involuntary statements and any physical evidence that would not have been discovered inevitably shall be suppressed.

Judgment vacated; remanded for further proceedings not inconsistent with this opinion.