Argued and submitted January 29, reversed and remanded April 1, petition for review denied September 29, 1998 (327 Or 554)

## STATE OF OREGON,
*Appellant,*

*v.*

## ERIK CHARLES SNUGGERUD,
*Respondent.*

## (96NB0442; CA A94883)

956 P2d 1015

Rolf C. Moan, Assistant Attorney General, argued the cause for appellant. With him on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Daniel Q. O'Dell, Deputy Public Defender, argued the cause for respondent. With him on the brief was Sally L. Avera, Public Defender.

Before De Muniz, Presiding Judge, Haselton, Judge, and Rossman, Senior Judge.

HASELTON, J.

## HASELTON, J.

The state appeals the trial court's order suppressing defendant's post-arrest statements and the results of an Intoxilyzer test. The state argues that defendant's statements made to a police officer were admissible because, regardless of whether defendant was properly warned of his constitutional rights upon arrest, defendant volunteered the statements. Further, the state argues, *inter alia,* that the results of the Intoxilyzer test should have been admitted because the arresting officer complied with all the requirements for administering the Intoxilyzer test, including the 15-minute pre-test observation requirement. We agree and reverse.

On February 2, 1996, North Bend Police Officer Bennett stopped defendant for following another vehicle too closely. Bennett asked defendant some questions, administered field sobriety tests, and arrested defendant for driving under the influence of intoxicants. Bennett placed defendant in his patrol car and "advised him of his *Miranda* rights."

Bennett drove defendant to the police department, and, upon arrival, he examined the inside of defendant's mouth, where he saw nothing. Bennett and defendant then stepped out of the patrol car and walked into the police department. Once inside, at 8:08 p.m., Bennett began watching defendant for the 15-minute pre-test observation period before administering the Intoxilyzer test. Between the time Bennett and defendant left the patrol car and 8:08, Bennett did not see defendant put anything in his mouth or regurgitate.

During the required observation period, defendant asked Bennett if he could blow his nose. Bennett agreed. At 8:12, after defendant had blown his nose, Bennett again checked defendant's mouth to "confirm that he had not placed anything in his mouth."

At 8:25, 17 minutes after Bennett had begun observing defendant, Bennett administered the Intoxilyzer test. During the suppression hearing, Bennett testified that he watched defendant during the entire 17-minute period. He

also testified that, during that period, he did not see defendant put anything into his mouth or regurgitate, and that defendant did not suggest to him that he had regurgitated or put something in his mouth.

The results of the Intoxilyzer test showed that defendant's blood alcohol content was .18 percent. Following the test, the following tape-recorded exchange occurred:

"[Defendant]:  [Unintelligible question]

"[Bennett]:  What's that?

"[Defendant]:  [Unintelligible question]

"[Bennett]:  The machine registers a point one eight blood alcohol content.

"[Defendant]:  A one eight? How can it be a one eight, sir? I'm not that drunk. That's for damn sure.

"[Bennett]:  That's what the machine printed. If you'd wish to have a blood test—

"[Defendant]:  I'd rather have a blood test, that's for sure. I'm not one eight."

The tape recording ended at that point. Bennett testified in the suppression hearing that defendant subsequently asked if he could take a second test. Bennett administered a second test, and the results showed defendant's blood alcohol content to be .17 percent. Defendant was issued a citation and, as Bennett testified, "was free to go." Defendant made a telephone call and later left with someone who came to get him.

Defendant was charged with driving under the influence of intoxicants. ORS 813.010. Defendant moved to suppress the statements he made to Bennett following the first Intoxilyzer test and the results of "any Intoxilyzer 5000 test." Defendant contended that his statements "were not voluntarily made and not obtained pursuant to *Miranda v. Arizona*, 384 US 436[, 86 S Ct 820, 16 L Ed 2d 694] (1966)." He argued that the results of the Intoxilyzer tests were inadmissible "because the operator failed to comply with the requirements of ORS 813.100, 813.100(1), 813.010, 813.160(b)(A-E)."

The trial court granted defendant's motion to suppress the statements and the results of the first Intoxilyzer test[1] and made the following pertinent findings and conclusions:

"(4) The Court specifically finds that the State of Oregon did not lay a foundation for the Miranda Rights given, did not lay a foundation for a knowing and understanding waiver and did not lay a foundation for voluntariness of the statements.

"* * * * *

"(6) The Court specifically finds that:

"(a) The State did not offer a certified copy of the Officer's permit;

"(b) The State did not prove compliance with ORS 813.160(1)(b)(C);

"(c) The Officer did not comply with the 15 minute observation period requirement;

"(d) Defendant was not afforded a reasonable opportunity for a blood test."

On appeal, the state raises five assignments of error. In its first assignment, the state argues that the trial court erred in suppressing the statements defendant made after the first Intoxilyzer test because, regardless of whether defendant was adequately advised of, or waived, his constitutional rights, those statements were volunteered and not made in response to interrogation.

■ We agree with the state. "Volunteered statements not the result of any questioning or inducement are admissible even though the requirements of *Miranda* have not been fulfilled." *State v. Joseph*, 252 Or 610, 615, 451 P2d 468 (1969). Thus, "whether defendant was properly advised or not is irrelevant because the admitted statements were not the result of custodial *interrogation.*" *Id.* at 616. *See also Miranda*, 384 US at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their

---

[1] The state did not seek to admit the second Intoxilyzer test results, and the state does not argue on appeal that, regardless of the admissibility of the results of the first Intoxilyzer test, the results of the second are admissible.

admissibility is not affected by our holding today."); *State v. Houston*, 110 Or App 19, 23, 821 P2d 1093 (1991) (The defendant's statements were admissible because the "defendant did not make any statements in response to interrogation."); *State v. Onuskanich*, 86 Or App 454, 458-59, 739 P2d 1062, *rev den* 304 Or 240 (1987) (The defendant's unwarned statements were admissible because "if there is no interrogation, there is no need for the warnings.").

Here, defendant does not argue that he was responding to police interrogation when he commented on the results of the first Intoxilyzer and, particularly, when he exclaimed, "A one eight? I'm not that drunk." Defendant was not, in fact, interrogated. The officer's statement describing the test result did not invite a response.[2]

Defendant argues, nevertheless, that, even if the trial court erred in its *Miranda*-based analysis, his comments should be suppressed because the state failed to prove that those comments were voluntary. As support for that argument, defendant points to language in the trial court's findings that the state "did not lay a foundation for voluntariness of the statements."

Defendant's argument fails because, in moving to suppress, he failed to raise or identify a voluntariness argument distinct from the *Miranda*-based argument we have just considered and rejected. "A defendant's admissions may be suppressed as involuntary either because they were the product of coercion or because the defendant's *Miranda* rights were violated." *State v. Gable*, 127 Or App 320, 324, 873 P2d 351, *rev den* 319 Or 274 (1994). Here, however, it is apparent from the totality of the parties' arguments and memoranda to the trial court that the only issue as to voluntariness was predicated upon the alleged *Miranda* violation. Given that context, the reference to voluntariness in the trial court's order necessarily pertained only to the *Miranda*-related issue, and, thus, the order does not provide a basis

---

[2] An "interrogation" occurs either when a person is expressly questioned or when police employ a "practice that [they] should know is reasonably likely to evoke an incriminating response from a suspect." *Rhode Island v. Innis*, 446 US 291, 301, 100 S Ct 1682, 64 L Ed 2d 297 (1980). *See also State v. Onuskanich*, 86 Or App 454, 458, 739 P2d 1062 (1987).

separate from *Miranda* for suppression of the statements. We conclude that the trial court erred in suppressing defendant's statements following the first Intoxilyzer test.

■    The state's second through fifth assignments of error address the trial court's suppression of the first Intoxilyzer test results and, particularly, the four separate grounds on which the trial court based that ruling. In the second assignment, the state argues that the court erred in concluding that the state failed to prove compliance with ORS 813.160-(1)(b)(C), which requires that trained technicians periodically certify the accuracy of Intoxilyzer equipment.[3] The certification documents the state submitted provided, in part, that the "undersigned trained technician * * * certifies, in accordance with ORS 813.160, that on the date indicated below, the [Intoxilyzer] equipment was tested." We agree with the state that that documentation satisfied the requirements of the statute, as amplified in *State v. Pfortmiller*, 53 Or App 394, 400-01, 632 P2d 459, *rev den* 291 Or 893 (1981). Consequently, the court erred in suppressing the Intoxilyzer results on that basis.

In its third assignment of error, the state argues that the trial court erred in concluding that, because the state did not introduce a certified copy of Officer Bennett's permit to administer the Intoxilyzer test, it had failed to prove compliance with ORS 813.160, and, thus, the results were inadmissible.

---

[3] ORS 813.160(1) provides:

"To be valid under ORS 813.300:

"* * * * *

"(b)    * * * For purposes of this paragraph, the Department of State Police shall do all of the following:

"* * * * *

"(C)    Test and certify the accuracy of equipment to be used by police officers for chemical analyses of a person's breath before regular use of such equipment and periodically thereafter at intervals of not more than 90 days. Tests and certification required by this subparagraph shall be conducted by trained technicians. Certification under this subparagraph does not require a signed document."

ORS 813.160(1)(b) provides:

"Chemical analyses of a person's breath shall be performed by an individual possessing a valid permit to perform such analyses issued by the Department of State Police[.]"

At the suppression hearing, Bennett testified that, after receiving training from the Oregon State Police, he received a permit to administer Intoxilyzer tests. The state offered a non-certified copy of that permit, and Bennett testified that that exhibit "is a copy of my permit * * * to operate the Intoxilyzer 5000." The trial court found that that evidence was insufficient to establish compliance with ORS 813.160(1)(b):

"Exhibit 3, which was the permit of Officer Bennett—the law does seem to require that there be a certified copy of the permit introduced into evidence by the state in order for the person who actually operated the Intoxilyzer to be able to testify. That was not done."

The state contends that the court erred in concluding that ORS 813.160(1)(b) requires submission of a *certified* copy of the administering officer's permit. We agree. Nothing in the rule requires that the state provide a certified copy, or any particular form of evidence, to prove that an officer is qualified to perform an Intoxilyzer test. Nor is the submission of a *certified* copy required under OEC 1005 (providing for proof of the contents of an official record through submission of a copy "certified as correct"). The determination of whether Bennett had a valid current permit was a "determination of [a question] of fact preliminary to admissibility of evidence" under OEC 101(4)(a). *See generally State v. Winters*, 34 Or App 157, 161, 578 P2d 439, *rev den* 284 Or 80a (1978) ("The court must make a preliminary determination as to whether the witness had a valid current permit to operate the breathalyzer at the time the test was given. The testimony regarding the test and its results are not otherwise admissible."). The requirements of OEC 1005 do not apply to such preliminary determinations. *See* OEC 101(4)(a). Here, not only did the state offer a copy of Bennett's permit but Bennett himself testified that he was qualified to operate the Intoxilyzer and that he possessed a valid permit.[4] Defendant

---

[4] Defendant objected to Bennett's testimony as "irrelevant," and the court overruled that objection. On appeal, defendant does not cross-assign error to that ruling. Defendant raised no other objections to Bennett's testimony.

identifies no countervailing evidence in the record, and the trial court identified no basis for rejecting that proof other than its erroneous belief that a certified copy was required. Accordingly, the state met its burden under ORS 813.160-(1)(b).

In its fourth assignment of error, the state argues that the trial court erred in holding that Bennett did not comply with the 15-minute pre-test observation requirement. In ruling at the end of the suppression hearing, the court explained:

"I do find that the 15 minutes—that specific requirement of law—was not satisfied. It seems again so easy for the officer to have simply waited another couple of minutes in order to be sure that the 15 minutes had passed from the time he checked the defendant's mouth which he said by his watch was 8:12.

"Again, another problem with that is that we all know watches and clocks vary and time on the Intoxilyzer ought to be the time he's using in order to measure the 15 minutes and when you're as close to being 15 minutes as this was that's even more critical. I recognize that he said that he checked his mouth when he was in the squad car and there was nothing in it and that when they got into the squad room which he thought was about 8:08 that from that point on he watched him. But what's missing, [counsel], is there's no testimony that between the time they left the police car until he started watching him in the squad room, [defendant] didn't regurgitate, vomit, put something in his mouth, whatever. Obviously, the officer had good reason to be concerned when [defendant] blew his nose; he did check his mouth at that time but I'm going to find that he didn't testify that he watched him for a full 15 minutes as required under the statute before administering the breathalyzer."

Further, the trial court found that defendant blew his nose at 8:12 and further found that

"[i]f an officer allows a person to blow their nose, do anything which could obviously skew the results of the Intoxilyzer, then their 15 minutes needs to start over."

Thus, the trial court found that Bennett failed to comply with the 15-minute pre-test observation requirement in three

respects: (1) The use of two time pieces was, as a matter of law, erroneous; (2) The state failed to offer evidence showing that defendant had nothing in his mouth when the observation period began at 8:08; and (3) As a matter of law, when defendant blew his nose at 8:12, the 15-minute observation period necessarily started over, rather than continued.

■ We agree with the state that each of those grounds was erroneous. First, with respect to the administering officer's use of two time pieces, we have previously considered, and rejected, a similar argument. In *State v. Edwards*, 99 Or App 227, 229-30, 781 P2d 1233 (1989), the trial court concluded that suppression was warranted where the testing officer used two different time pieces to measure the beginning and end of the 15-minute observation period. We reversed:

> "If the court's ruling means that, as a matter of law, the officer must use only one time piece in calculating the 15-minute period, it is in error. If the court concluded that the state did not show compliance with the rule as a matter of fact, there is no evidence to support that conclusion." 99 Or App at 230.

The same reasoning applies here. An officer is not required to use the same time piece to measure the beginning and end of the observation period. Here, defendant identified no evidence in the record showing any discrepancy between the two time pieces, much less one that resulted in an actual observation of less than 15 minutes by the officer.

■ The trial court similarly erred in concluding that the officer was required to check defendant's mouth at the beginning of the observation period. The regulation that governed the pre-test observation period, OAR 257-30-070, provided:

> "The following method of performing Chemical Analysis of a persons [*sic*] breath is approved for the Intoxilyzer 5000:

> "* * * * *

> "(2)   Pre-Test Requirement:

> "(a)   The operator is certain that the subject has not taken anything by mouth (drinking, smoking, eating, taking medication, etc.), vomited, or regurgitated liquid from

the stomach into mouth, for at least fifteen minutes before taking the test."[5]

Under the prior version of the rule, which required the administering officer to "make certain" that the subject had not ingested, vomited, or regurgitated, we held that the rule did not require the officer to examine the subject's mouth at the beginning of the observation period. Rather, the officer's continuous observation of the defendant was sufficient to establish compliance with the 15-minute pre-test observation period. *See State v. Kacalek*, 34 Or App 967, 970, 580 P2d 205 (1978) ("The rule imposes no such requirement and we decline to amend the rule by holding, as a matter of law, it must be required."). Nothing in the "be certain" language of the current rule dictates revisiting that result. The officer's continuous observation of defendant beginning at 8:08 p.m. satisfied the rule's requirement. *See generally State v. Tynon*, 152 Or App 693, 955 P2d 250 (1998). *See also State v. Balderson*, 138 Or App 531, 910 P2d 1138, *rev allowed* 324 Or 305 (1996); *State v. Lessar*, 105 Or App 512, 805 P2d 730, *rev den* 311 Or 482 (1991).

■ Finally, with respect to the observation period, the court also erred in concluding that defendant's act of blowing his nose automatically restarted the 15-minute observation period and, consequently, disqualified the results of the test. OAR 257-30-070(2)(a) did not refer to blowing one's nose during the 15-minute period. *See State v. Hanson*, 19 Or App 498, 503, 528 P2d 100 (1974), *rev den* (1975) (The 15-minute observational rule does not require the operator to "make certain" that the subject did not cough.). Moreover, unlike the conduct that does invalidate test results—"tak[ing] anything by mouth * * *, vomit[ing], or regurgitat[ing]"—blowing one's nose does not involve placement of substances in the mouth. *Id.* As we explained in *Hanson*:

> "The approved methods set out by the Health Division in OAR ch 333 are designed to assure an uncontaminated breath sample; both vomiting—discharge from the stomach through the mouth—and regurgitation of liquids from the stomach into the mouth are likely to result in the presence

---

[5] OAR 257-30-070 has since been amended and renumbered, but the changes to the portion of the rule pertinent here are minimal.

of residual mouth alcohol which will cause the test results to show an artificially high percentage of alcohol. A 'cough'—'to expel air suddenly and noisily from the lungs * * *' (Webster's New Twentieth Century Dictionary 415 (unabridged 2d ed 1964))—will not cause the same contamination the regulation seeks to avoid." *Id.*

Defendant asserts, nevertheless, that, because Bennett rechecked his mouth after he blew his nose, that demonstrated sufficient "uncertainty" to restart the 15-minute period. Bennett acknowledged that he did check defendant's mouth, after he blew his nose, "to reconfirm" that he had not put anything into his mouth. However, there is no evidence that Bennett found anything and, indeed, he continued the observation period. Thus, although Bennett may have been momentarily uncertain about whether there was anything in defendant's mouth after he blew his nose, that uncertainty proved groundless upon inspection. Thus, the 15-minute "clock" did not restart.

In its fifth and final assignment of error, the state argues that the trial court erred in excluding the Intoxilyzer results on the ground that Bennett had interfered with defendant's entitlement to obtain a blood test under ORS 813.150. That statute provides:

"In addition to a chemical test of the breath, blood or urine administered under ORS 813.100 or 813.140, upon the request of a police officer, *a person shall be permitted upon request*, at the person's own expense, reasonable opportunity to have any licensed physician and surgeon, licensed professional nurse or qualified technician, chemist or other qualified person of the person's own choosing administer a chemical test or tests of the person's breath or blood for the purpose of determining the alcoholic content of the person's blood." (Emphasis supplied.)

The state argues that Bennett was not required to inform defendant of his rights under ORS 813.150 and that Bennett did nothing to actively hamper defendant from getting a blood test. Defendant counters that he requested a blood test, and that, by ignoring that request, Bennett impermissibly interfered with his rights. ORS 813.150 does not require an officer to advise an individual that he or she has a

right to have an independent breath or blood test. The statute does, however, require that a person who so requests be permitted a reasonable opportunity to obtain such a test. Thus, the critical issue here is whether defendant did, in fact, express his desire to obtain an independent test and, if so, whether Bennett or any officer acted in such a way as to not "permit" that request.

Here, after defendant took the Intoxilyzer test, Bennett said, "If you'd wish to have a blood test —." Defendant replied, "I'd rather have a blood test, that's for sure." Defendant then requested, and took, a second Intoxilyzer test. He made a telephone call and a friend later picked him up. Defendant was not prevented by any "affirmative conduct" of police officers from getting a blood test. *See State v. Miller*, 41 Or App 687, 691, 598 P2d 1262 (1979) (the defendant declined to go to the hospital for a blood test; no "affirmative conduct on the part of the police * * * denied defendant a reasonable opportunity to obtain" a blood test). Defendant's comment that he would "rather have a blood test" did not create an obligation to transport defendant to a hospital. Bennett's only obligation was, once becoming aware of defendant's desire to get a blood test, to "permit" him a reasonable opportunity to get that test. Bennett satisfied that duty.[6] *Id. Cf. State v. Hilditch*, 36 Or App 435, 584 P2d 376 (1978) (by requiring the defendant to leave the hospital and return to jail before the defendant's wife could arrive with money to pay for an independent test, the police actively prevented the defendant from obtaining an independent test). Accordingly, and for the other reasons set out above, the trial court erred in suppressing the Intoxilyzer results.

The trial court erred in granting defendant's motion to suppress.

Reversed and remanded.

---

[6] Defendant argues that "[a]lthough the officer suggested in his testimony that defendant was not in custody after the breath test, the facts in the record also suggest that defendant was kept in the police station until his friend arrived to pick him up. The time frame appears to have been at least thirty minutes, or longer." However, defendant includes no citation to the record supporting that characterization.