966 F.2d 1440
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES of AMERICA, Appellee,
v.
UBALDO Hine-Pino, Defendant, Appellant.
UNITED STATES of AMERICA, Appellee,
v.
RICARDO Gonzalez-Suarez, Defendant, Appellant.
 Nos. 91-1916, 91-1917.
 United States Court of Appeals,
First Circuit.
 May 27, 1992
 
 Jose C. Romo Matienzo, by Appointment of the Court, for appellant Ubaldo Hine-Pino.
 Aida M. Delgado-Colon, Assistant Federal Public Defender, with whom Benicio Sanchez Rivera, Federal Public Defender, was on brief for appellant Ricardo Gonzalez-Suarez.
 Jose A. Quiles-Espinosa, Assistant United States Attorney, with whom Warren Vazquez, Assistant United States Attorney, and Daniel F. Lopez-Romo, United States Attorney, were on brief for the United States.
 Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Boyle,* District Judge.
 CAMPBELL, Senior Circuit Judge.
 
 
 1
 After a jury trial in the United States District Court for the District of Puerto Rico, defendants, Ubaldo Hine-Pino and Ricardo Gonzalez-Suarez, were convicted on three counts: knowingly and willfully importing approximately 10 kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1); knowingly and willfully possessing 10 kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 952(a); and willfully possessing cocaine on board a vessel without registering it in the cargo manifest, in violation of 21 U.S.C. § 955. The district court sentenced both defendants to concurrent prison terms of 121 months for each count and concurrent five year terms of supervised release. The court also imposed on each defendant a special monetary assessment of $150.00. Both defendants appeal from their conviction. We affirm.
 
 I.
 
 2
 On December 21, 1990, the Euro-Colombia, a cargo ship owned by the Luis Ayala Coln Company, arrived in Ponce, Puerto Rico from Santa Marta, Colombia. As the ship was being unloaded, Antonio Lledo, director of unloading operations, noticed two individuals jump from the ship to the pier. Because he did not recognize the individuals as crew members, Lledo called Manuel Fernndez Irizarry, an employee of Luis Ayala Coln Company, to report the problem. Fernndez took his radio and ran to the ship. As he approached the vessel, he saw both defendants come toward him. He testified that they were wearing blue baseball caps and buttoned-up jackets. Fernndez instructed them to stop, but the defendants ignored him. When Fernndez saw one of the defendants place his hands inside his jacket, he feared that they might be armed, so he moved away and notified United States Customs Inspectors.
 
 
 3
 When Customs Inspectors arrived they found defendants in the water surrounded by floating packages which they later determined contained cocaine. Defendants, although reluctant at first, eventually swam to shore and were detained. When defendants emerged from the water their jackets and baseball caps were missing. Authorities retrieved the floating cocaine packages, some personal documents and one baseball cap from the water. Defendant's jackets were never found. Customs officials also retrieved from defendant Hine-Pino half of a United States dollar bill and a slip of paper on which the word's "snowy crystal" appeared. One customs agent testified that in his experience, the half United States dollar was commonly used as a signal or password in drug or other types of transactions. He also testified that smugglers commonly use the term "snowy crystal" to refer to cocaine before it is divided.
 
 
 4
 Customs officials took defendants to the United States Customs Enforcement Office where Customs Enforcement Officer Radames Snchez read them their Miranda rights in Spanish. Defendants indicated that they understood their rights. In addition, they refused to sign a rights waiver and requested an attorney. Officer Snchez testified that neither he nor any other officer initiated questioning of defendants once they had expressed a desire for counsel. He also testified, however, that while in the presence of defendants, he engaged in conversations with Angel Morales Amaro, a Puerto Rico Police Officer, about computer procedures not directly related to the case.
 
 
 5
 At one point, defendant Gonzalez Suarez said that he wanted to place a telephone call to Colombia to let his family know that he was all right. Officer Snchez responded that this would not be a problem and that he would let him make the call in a few minutes. According to Officer Snchez, Gonzalez Suarez then started to confess, saying that he was worried about his family, that he brought the cocaine over because his family was threatened in Colombia and that the baseball hat he was wearing was to identify him to the people awaiting the drugs in Puerto Rico. Snchez testified that defendant Hine-Pino started making the same confession after defendant Gonzalez Suarez was finished. In his report, Snchez failed to mention Hine-Pino's confession, although he did report Gonzalez Suarez's confession. He testified that this was an oversight. The customs officials did not secure signed confessions from defendants.
 
 II.
 
 6
 Both defendants contend on appeal that the district court erred in admitting their alleged confessions. They also contend that the evidence adduced at trial was insufficient to support a verdict of guilt beyond a reasonable doubt. We address each of these arguments.
 
 A. Admission of Confessions
 
 7
 At trial, defendants moved to suppress testimony about the alleged confessions. They contended that customs officials elicited the confessions through subtle interrogation carried on after they had asserted their right to counsel and in the absence of a valid waiver of their rights. After a hearing outside the presence of the jury, the district court found that the defendants' statements "were voluntarily given" and were not the product of prodding or questioning by customs officers. The court, accordingly, allowed the statements. In challenging that ruling on appeal, defendants argue that, while their confessions may not have been the product of direct interrogation, they were the product of indirect pressures created when the customs officers discussed aspects of the case, between themselves, in defendants' presence. We find no error in the district court's ruling that defendants' statements were voluntarily given.
 
 
 8
 In Miranda v. Arizona, the Supreme Court held that an accused has a right under the Fifth and Fourteenth Amendments to remain silent and to the presence of counsel during a custodial interrogation. 384 U.S. 436 (1966). While an accused may waive his rights, once he has asserted the right to have counsel present, additional safeguards are required. Specifically, when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
 
 
 9
 Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Interrogation can take many forms. It "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).
 
 
 10
 Defendants contend here that Officers Snchez and Morales Amaro were most likely discussing and putting into the computer all information relevant to defendants' case at the time the latter confessed. It is common knowledge, defendant Gonzalez Suarez argues, that case reports include information regarding the offense, penalties, and subsequent criminal judicial proceedings. It follows that such information was probably being discussed among the officers in the presence of both defendants and that this exerted coercive pressure. Both defendants assert that there could be no other reasonable explanation why defendants having recently requested an attorney and refused to sign a waiver of their rights would have spontaneously confessed. Accordingly, defendants wish us to conclude that Officers Snchez and Morales Amaro coerced defendants into confessing.
 
 
 11
 At the hearing to determine the voluntariness of the confessions, Officer Snchez testified that after he read defendants' their rights and after they requested counsel, neither he nor any other officer attempted to question defendants. He testified that he simply "proceeded to do the rest of the procedures, I entered the case in the computer and all this." He further responded to questions from the court as follows:
 
 
 12
 Court: What happened next?
 
 
 13
 Snchez: Amaro comes in and, as he comes in, he was asking me some questions about the case.
 
 Court: Amaro and you, then, are discussing
 
 14
 Snchez: We're not discussing the case, he is just asking me about some procedures, separate from the case itself, not related to this case, but to the computer, then, at that time, Ricardo
 
 
 15
 [Gonzalez Suarez] started to make a statement.
 
 
 16
 Both defendants had an opportunity to cross-examine Snchez concerning this testimony. Neither counsel for defense, however, examined Snchez about any aspect of the conversation between the customs officers that defendants now allege coerced them into confessing.
 
 
 17
 At the conclusion of the hearing the district court judge stated:
 
 
 18
 I was very specific in the questions I asked Mr. Snchez, whether any prodding had been made or any questions had been propounded to the two defendants after they had expressed their desire to have an attorney; and if he would have said that, yes, a question was made, then I would have not admitted those statements. But being the way that this was done and that no questions were propounded to them to get them to waive their right or to make statements, and given the credibility that I give to Mr. Snchez testimony, the Court rules, then, that these statements will be admissible and they will go to the jury tomorrow.
 
 
 19
 Based on this record, we cannot say that the district court committed error in determining that no questioning at all had occurred, or in failing to find that the conversation between the officers amounted to the subtle form of interrogation forbidden in Innis, 446 U.S. at 301. Defendants point to nothing specific of a suggestive or coercive nature. Instead, they ask the court to speculate that because there is no explanation for why they confessed after asking for counsel, then they must have been coerced. This does not necessarily follow.
 
 
 20
 Defendants argue that their confessions were not voluntary for another reason. According to defendants they did not fully understand their rights. The district court fully explored this possibility at the voluntariness hearing. After questioning Officer Snchez about the procedures that were followed in arresting defendants, the district court concluded the following:
 
 
 21
 From the testimony of Mr. Snchez I find him credible, that he took his time, that he wanted to make sure that, coming from a foreign country, they understood what our system of justice was; insofar as explaining their rights, he took his time to make sure that they did; and the best evidence of that is that they told him that they did not want to talk anymore until they contacted an attorney, and that they did not want to sign anything. If afterwards they gave a statement, that was a matter of their own choosing.
 
 
 22
 We have said that "assessing the credibility of witnesses is solely the province of the trier of fact." United States v. Green, 887 F.2d 25, 28 (1st Cir. 1989) (citation omitted). We see no clear error in the district court's conclusion based on the record before us. Accordingly, we hold that the district court properly admitted the confessions. See Miranda, 384 U.S. at 478 ("[c]onfessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").
 
 B. Sufficiency of the Evidence
 
 23
 Defendants also appeal from the district court's denial of their Rule 29 motions for a judgment of acquittal. According to defendants the government's only direct evidence against them was their alleged confessions which they contend should not have been admitted. The government's remaining evidence, defendants argue was all circumstantial and was insufficient to support a jury finding of guilt beyond a reasonable doubt. This court assesses "the sufficiency of the evidence as a whole, including all reasonable inferences, in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991). The "prosecution may prove its case by circumstantial evidence, and it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilty beyond a reasonable doubt." United States v. Hilton, 894 F.2d 485, 487 (1st Cir. 1990). If the evidence supports various interpretations, issues of credibility should be resolved in favor of the jury's verdict. United States v. McNatt, 813 F.2d 499, 502 (1st Cir. 1987).
 
 
 24
 We find ample evidence here from which a jury could conclude beyond a reasonable doubt that defendants were guilty of the offenses charged. Even without the confessions, which were properly admitted, the government's evidence was sufficient to support the jury's verdict. Antonio Lledo, director of unloading operations, testified that he saw two men wearing jackets and caps, whom he did not recognize as crew members, jump off the cargo ship onto the pier. He could not identify defendants as the two men he saw. Manuel Fernndez Irizarry, an employee of Luis Ayala Colon Company, testified that he arrived on the scene after Lledo alerted him to the problem, and he witnessed defendants walking down the pier wearing jackets and baseball caps. He testified that when he asked them to stop they kept on walking. Fernndez alerted customs officials and when he returned to the pier he testified that defendants were in the water. He further testified that when defendants emerged from the water "they did not have the jackets on, they did not have their caps on, and there was one who did not have a shirt nor a T-shirt." Fernndez as well as other customs officials also testified that defendants were seen surrounded by several small packages which officials later determined contained cocaine. From this evidence a rational jury could reasonably infer that defendants were not just stowaways trying to get to America as defendants claimed but rather that they possessed cocaine on board a vessel and imported the cocaine into the United States. See United States v. Passos-Paternina, 918 F.2d 979, 983 (1st Cir.), cert. denied, 111 S. Ct. 1637 (1990) ("[w]e defer, within reason, to inferences formulated by the jury in the light of its collective understanding of human behavior in circumstances revealed by the evidence."); United States v. Smith, 680 F.2d 255, 260 (1st Cir. 1982) (the jury is "not required to divorce [itself] of common sense' where, as here, the [defendants'] portrayal[s] of [themselves] as [ ] innocent bystander[s] is inherently unbelievable.").
 
 
 25
 Affirmed.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation