KESSLER, P.J.
¶1 William Lester Jackson appeals the judgment of conviction, following a jury trial, of one count of being a felon in possession of a firearm. Jackson argues that the trial court erred in denying his motion to suppress statements he made while in custody. We affirm.
BACKGROUND
¶2 On May 7, 2016, Jackson was charged with one count of being a felon in possession of a firearm. According to the criminal complaint, on May 4, 2016, Jackson was admitted to St. Joseph's Hospital in Milwaukee for a gunshot wound to his left thigh. Detective Tracy Becker spoke with Jackson at the hospital about the circumstances in which Jackson received the wound. Jackson initially told Becker that he was shot while at a gas station purchasing a cigarette. Later, Jackson admitted that a friend left the firearm in the back of the car Jackson was driving and that he was trying to clear a jam in the gun's ejector port when the gun fired and struck him in the leg. Jackson then drove himself to the hospital. He also admitted that he was a convicted felon.
¶3 Jackson filed a motion to suppress the statements he made to Becker while in the hospital on the grounds that the statements and all other evidence derived from those statements were obtained "as a result of a custodial interrogation without having properly [been] advised of his Miranda warnings." (Bolding and italics added.)[1]
¶4 At a hearing on the motion, Milwaukee Police Officer Robert Crawley testified that he was dispatched to St. Joseph's Hospital on the morning of May 4, 2016, to investigate multiple shootings, including one homicide. Crawley described the atmosphere at the hospital as "chaotic" because the families of multiple shooting victims were "running around trying to get to the rear of the hospital where all three victims were at." Crawley stated that he met with Jackson in the emergency room. Jackson initially refused to answer any questions and provided Crawley with a fake name. Crawley testified that Jackson's hospital room was in the same hallway as the homicide victim. Within about five minutes of entering Jackson's room, about twenty to thirty people tried to enter the hospital with regard to the homicide victim. Crawley testified that he had to leave Jackson's room to try to control the "rush of people that was coming through the hallway," but that prior to leaving the room he informed Jackson that Jackson could not leave because "we really, truly needed to find out what happened." Crawley stated that he did not suspect Jackson of a crime at that point, but he handcuffed Jackson's right hand to the hospital bed because Crawley "needed to try to control him or to control the situation while [he] actually handle[d] our bigger situation that was going on at that time." Crawley further testified that he suspected Jackson was a victim of a crime and did not want Jackson to leave. Crawley explained why he handcuffed Jackson:
[T]o control a situation, if we don't have enough officers or we don't have control of the scene, we have to do I guess things a little unorthodox to make sure we make sure our victims are safe and the city -- citizens of Milwaukee are safe I guess.
....
... I think the hospital was all done dealing with him at that point, so he could have got up and walked out.
¶5 Shortly after Crawley left Jackson's room, Crawley updated Detective Becker about Jackson's lack of cooperation. Becker testified that the hospital was "chaotic," but that he made his way to Jackson's room where Jackson told Becker that "[a]fter [Jackson] had dropped off his girlfriend's children, he went to a gas station to get a single cigarette and while outside the vehicle was shot by an unknown person." Becker told Jackson that Jackson's story "didn't make a lot of sense" and that the gas station would have video footage. Becker left Jackson's room to speak with Jackson's girlfriend, who was in the hospital waiting room. Jackson's girlfriend told Becker that Jackson drove her children to school and then later called to say he (Jackson) was going to the hospital because he had been shot. Becker stated that Jackson's girlfriend "voiced her concerns about what was going on."
¶6 Becker testified that he related Jackson's girlfriend's concerns to Jackson, but that Jackson continued to be evasive. Becker stated that he believed Jackson was the victim of a shooting and was covering up for the shooter. Becker testified that he inspected Jackson's pants for gunpowder residue to determine whether Jackson was shot at close range, but did not see any residue. Becker stated that he "goad[ed]" Jackson and Jackson ultimately admitted that the shot was self-inflicted. Jackson told Becker that he was out with a friend the previous evening and that the friend called Jackson that morning and told him that he (the friend) had left his gun in the car Jackson was driving. Jackson told Becker that he took his girlfriend's children to school and then found the gun in between the seats. Jackson also told Becker that there was a casing stuck in the ejector port of the gun and that he tried to clear it. The gun fired and struck Jackson in the leg. Jackson also told Becker that he was a convicted felon.
¶7 The trial court denied Jackson's motion to suppress his inculpatory statements. The court found that Jackson was in custody at the time he incriminated himself, but did "not find that this was interrogation." The court found that Becker's questions "were not intended to elicit an incriminating response ... he was merely trying to figure out the circumstances of how Mr. Jackson was shot, where he was shot, who shot him and ... why[.]... Becker clearly referred to his belief that ... Mr. Jackson was the victim in this case not ... necessarily a perpetrator." The court found that "there was a concern for ... the safety of all of the individuals involved not just Mr. Jackson but [his girlfriend], her family and then the other individuals who may have been impacted by this shooting, ... the detective was ... trying to determine whether other individuals were involved and who those individuals were."
¶8 The matter subsequently proceeded to a jury trial, where Jackson was found guilty as charged. This appeal follows.
DISCUSSION
¶9 At issue is the admissibility of statements Jackson made while handcuffed to the hospital bed. Jackson contends that the officers' failure to give him Miranda warnings renders the statements inadmissible. See Miranda v. Arizona , 384 U.S. 436 (1966). On appeal, we review a trial court's decision on a motion to suppress a confession under a mixed standard of review. See State v. Turner , 136 Wis. 2d 333, 343-44, 401 N.W.2d 827 (1987). We will sustain a trial court's findings of historical or evidentiary fact unless they are clearly erroneous, but we independently consider whether those facts show a constitutional violation. See id.
¶10 Under Miranda , "statements of the defendant obtained from questions asked while in custody or otherwise deprived of his [or her] freedom of action in any significant way could not be used as evidence against him [or her], unless preceded by the Miranda warnings." State v. Clappes , 117 Wis. 2d 277, 282, 344 N.W.2d 141 (1984) (emphasis omitted). The Miranda Court reasoned that the interaction of custody and official interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda , 384 U.S. at 467. In State v. Stearns , 178 Wis. 2d 845, 850, 506 N.W.2d 165 (Ct. App. 1993), we explained that "the warnings were not intended to unduly interfere with a proper system of law enforcement or to hamper traditional police investigatory functions." Rather,
[t]he [Miranda ] Court was concerned ... with "incommunicado interrogation of individuals in a police-dominated atmosphere," where the police actively sought to induce a defendant's confession. The Court concluded that in the absence of the now familiar warnings, statements made by a defendant during police custodial interrogation are inadmissible to establish the defendant's guilt. The Miranda Court reasoned that the interaction of custody and official interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."
Stearns , 178 Wis. 2d at 850 (citations omitted).
¶11 Here, there is no dispute that Jackson was in custody at the time he made his statements to Becker and that no Miranda warnings had been given. Nonetheless, the State contends that Jackson's statements were admissible because Jackson was not subject to an interrogation. We agree.
¶12 An interrogation encompasses questions or comments that "police should know are reasonably likely to elicit an incriminating response from the suspect" even though those questions or comments may not appear to do so directly. See Rhode Island v. Innis , 446 U.S. 291, 301 (1980). Here, Crawley and Becker were investigating three shootings that occurred on the same evening, one of which resulted in a death. Both officers testified that the hospital was "chaotic," with family members of the multiple shooting victims flooding the hospital halls and seeking answers about their relatives. Both officers testified that they initially believed Jackson to be a shooting victim . They wanted to determine who shot Jackson and for what reason. Neither officer suspected that the gunshot was self-inflicted; indeed Becker testified that he inspected Jackson's pants for gunpowder residue to determine whether Jackson was shot at close range. Becker also stated that he suspected Jackson was trying to cover for the shooter. Given all of these factors, we conclude that the officers' questions were not designed to elicit testimonial evidence against Jackson. Jackson's statements "were not the product of a successful 'incommunicado interrogation' in a police-dominated atmosphere in which the police actively sought to obtain" Jackson's confession to a crime. See Stearns , 178 Wis. 2d at 852 (citation omitted). Rather, Jackson's incriminating statement that he was a felon in possession of a firearm occurred while police were trying to determine who shot Jackson and whether Jackson's shooting was connected to any of the other shootings that police were investigating at the hospital. "The situation did not involve the type of custodial setting aimed at securing a confession with which the Miranda Court was concerned." See Stearns , 178 Wis. 2d at 852. For the foregoing reasons, we affirm.
By the Court. -Judgment affirmed.
Not recommended for publication in the official reports.

See Miranda v. Arizona , 384 U.S. 436 (1966).